# EXHIBIT A

IN THE CIRCUIT COURT FOR THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.:

LETIDAS LOGISTICS LLC, individually
and behalf of all others similarly situated,

      Plaintiff,

v.

CITIBANK, N.A.

      Defendant,

and

ROYAL BENGAL LOGISTICS, INC.,

      Nominal Defendant.

_____/

## CLASS ACTION COMPLAINT

Plaintiff, Letidas Logistics LLC ("Letidas" or "Plaintiff"), individually and on behalf of a

class of similarly situated individuals, by and through the undersigned counsel of record, hereby

sues Defendant, Citibank, N.A. ("Citi"), and Nominal Defendant, Royal Bengal Logistics, Inc.[1]

("RBL") (Citi and RBL collectively, "Defendants"), and in support thereof, states as follows:

## INTRODUCTION

1.    This action arises out of a massive fraud scheme orchestrated by RBL and aided

and abetted by Citi. Specifically, RBL orchestrated two overarching schemes: one centered on the

---

[1] On June 21, 2023, Judge Raag Singhal of the District Court for the Southern District of Florida entered an Order Granting Plaintiff Securities and Exchange Commission's Emergency Motion for Appointment of Receiver (the "Receiver Order") in the Securities and Exchange Commission's ("SEC") case against RBL largely stemming from the same schemes alleged herein (Case No. 23-61179-CIV-SINGHAL) (the "SEC Action"). Plaintiff is aware that the Receiver Order has enjoined any actions against RBL until further court order. Therefore, RBL is included herein as a nominal defendant only as Plaintiff is required from a pleading perspective to plead RBL's predicate acts before pleading Citi's aiding and abetting of such acts. Plaintiff intends to abide by all terms of the Receiver Order as applicable to this action.

*** FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 07/03/2024 03:59:12 PM.****

fictional sale of a semi-truck or a trailer (the "Equipment Scheme") and one centered on a long-term or short-term investment with a guaranteed fictional return (the "Loan Scheme") (the Equipment Scheme and the Loan Scheme collectively, the "Schemes"), and, then, Citi actively participated in helping RBL effectuate the Schemes. In effectuating the Schemes, RBL targeted both minorities and first responders.[2]

2.      In the Equipment Scheme, RBL induced investors to advance funds to purportedly purchase a semi-truck or a trailer. However, in reality, RBL diverted the investors' funds for other purposes—a classic Ponzi scheme. Similarly, in the Loan Scheme, RBL induced investors to advance funds in the form of a short-term or a long-term loan with a high interest rate. However, once again, in reality, RBL diverted the investors' funds for other purposes—yet another classic Ponzi scheme.

3.      All in all, from approximately August 2019 through June 2023, RBL raised $112 million from more than 1,500 investors, a majority of which were Haitian-American individuals residing in South Florida, but also included residents from at least seventeen other states, the District of Columbia, Haiti, Canada, and India.[3]

4.      Sadly, RBL did not act alone. Citi not only maintained the account that RBL used to facilitate the fraudulent scheme (the "Account") but, also, had actual control over each and every deposit made into the Account by unsuspecting investors. Indeed, as elaborated below, Citi flagged the Account for fraud, causing each and every deposit or withdrawal to be specifically approved by Citi before posting.

---

[2] For purposes of this Complaint, the focus is on the Equipment Scheme, as it appears that the Loan Scheme class as it pertains to Citi would contain only approximately ten (10) class members at this time. Plaintiff and the Class reserve the right to amend the Complaint should discovery reveal additional Class members.
[3] Upon information and belief, nearly 90% of the Class are residents of Florida.

5.      Citi monitored and reviewed the activity in the Account and not only failed to intervene but also controlled and approved each deposit to and withdrawal from the Account. Indeed, Citi served as a critical linchpin in the Schemes by legitimizing RBL's plot and facilitating it.   Citi had actual knowledge of RBL's fraud and acted in bad faith to provide substantial assistance.  In fact, no one knew more about the Schemes or was in a better position to put an end to the schemes than Citi.  Yet, driven by Citi's desire to gain more business from and make money on RBL, Citi engaged in a pattern of behavior that demonstrated its knowledge or willful ignorance of the Schemes.  In either case, Citi acted in bad faith in enabling the Schemes to continue for months, costing innocent investors millions of dollars in the process.

6.      Accordingly, Plaintiff now brings this class action to recover damages caused by RBL's actions in carrying out the Schemes and by Citi's knowledge of, willful indifference to, and bad-faith-driven substantial assistance to with perpetrating the Schemes.

## PARTIES, JURISDICTION, & VENUE

7.      This is an action for damages more than fifty thousand dollars ($50,000.00), exclusive of interest, attorneys' fees, and costs.

8.      Plaintiff, Letidas Logistics LLC, is a Georgia limited liability company with its principal place of business in Georgia.

9.      Defendant, Citibank, N.A., is a National Association chartered with the Office of the Comptroller of the Currency with its principal place of business in Sioux Falls, South Dakota and conducts business throughout Florida.  Among other things, Citi engages in the business of providing retail banking services to millions of customers, including customers in Florida.

10.      Nominal Defendant, Royal Bengal Logistics, Inc., is a Florida corporation with its principal place of business in Broward County, Florida.

11.     The Court has personal jurisdiction over Citi pursuant to Section 48.193(1)(a)(1) of the Florida Statutes because Citi operates, conducts, engages in, and carries on a business venture in Broward County, Florida.

12.     The Court has personal jurisdiction over RBL pursuant to Section 48.193(2) of the Florida Statutes because RBL is a Florida corporation with its principal place of business in Broward County, Florida.

13.     The Court also has personal jurisdiction over Defendants pursuant to Section 48.193(1)(a)(2) and (a)(7) of the Florida Statutes because they, respectively, committed in a tortious act in Florida.

14.     In addition, the Account held with Citi had a *situs* in Florida as the wiring instructions used by many members of the Class specifically provide the ABA/routing number 266086554, which is Citi's ABA/routing number for Florida accounts.  As a result, due process is not offended by this Court's exercise of personal jurisdiction over Citi as to the entire Class.

15.     Venue in this Court is proper pursuant to Sections 47.011, 47.041, and 47.051 of the Florida Statutes because: (a) RBL resides in this County; (b) at least one claim arose in this County as a result of RBL's actions, the harm to Plaintiff, and the location of RBL's Account; (c) Defendants have or usually keep an office in this County for transaction of their customary business; (d) Defendants acted jointly and in concert as to actions taken in this County; and (e) the agreements at issue between Plaintiff and RBL contain a venue provision requiring venue in this County.

16.     All necessary conditions precedent to bringing this action have either occurred or have been excused by Defendants.

## GENERAL ALLEGATIONS

A.     **RBL's Investment "Programs"—the Schemes**

17.     RBL is a transportation and logistics company registered as a common carrier with the U.S. Department of Transportation and located in Coral Springs, Florida.

18.     From at least August 2019 through June 21, 2023[4] (the "Relevant Period"), RBL operated the Schemes to fraudulently target South Florida's Haitian-American community, purporting to offer high-yield investment opportunities that generate 12.5% to 325% of "guaranteed" returns.  RBL duped more than 1,500 persons into investing approximately $112 million.

19.     To further its scheme, RBL offered investors at least two investment programs, promising guaranteed returns ranging from 12.5% to as high as 325% depending on the program. Those investment opportunities pertained to two overarching programs: the Loan Program and the Equipment Program (collectively, the "Programs"), both described below.

20.     Touting the success of its business model, RBL promised investors that their money would be used to grow RBL's operations and increase RBL's fleet of semi-trucks and trailers. Among other things, RBL assured investors and prospective investors that their investments were safe, that RBL's business did not depend on investor funds because it generated up to $1 million per month, and that RBL had a fleet of over 200 semi-trucks and growing.

21.     In reality, however, since August 2019, RBL operated its trucking business at a loss of more than $18 million.  Without sufficient revenue to pay returns owed to investors, RBL used approximately $70 million of new investor funds to pay promised returns and redemptions to existing investors.

---

[4] The date on which the Receiver Order was entered.

22.     RBL did not disclose to investors and prospective investors RBL's intent to misappropriate investor funds.  Nor did RBL disclose that investor funds would be used to trade hundreds of millions of dollars of equities on margin.

23.     RBL was unable to pay the interest and principal owed to hundreds of investors absent an influx of new-investor money to perpetuate the Schemes.  So, in true Ponzi fashion, RBL decided to rob from Peter to pay Paul.

24.     One thing that the above-mentioned Programs had in common was that RBL advertised the Programs to unsuspecting investors as having a guaranteed return on investment.

25.     During the Relevant Period, a special relationship existed between RBL, on the one hand, and Plaintiff and Class members, on the other hand.

26.     During the Relevant Period, RBL owed a fiduciary duty to Plaintiff and Class members.

27.     During the Relevant Period, Plaintiff and Class members were investors in RBL, creating a special relationship between RBL, on the one hand, and Plaintiff and Class members, on the other hand.

i.     The Equipment Program—Semi-Trucks and Trailers

28.     As part of the Equipment Scheme, investors had the option to purchase a semi-truck ("Semi-Truck Option") or a trailer ("Trailer Sponsorship Option") (collectively, the "Equipment Program") or both.

29.     The Semi-Truck Option of the Equipment Program had the longest term and offered the highest potential returns of any of the RBL Programs.

30.     The Semi-Truck Option of the Equipment Program was a five-year program that required a minimum investment of $55,000.00 that RBL purported would be used to purchase a semi-truck on behalf of the investor.

31.     RBL represented to prospective investors in the Semi-Truck Option of the Equipment Program that RBL would purchase and operate the semi-truck in the name and on behalf of the investor, including (1) identifying and purchasing the semi-truck; (2) obtaining licensing, registration, and insurance; and (3) maintaining the semi-truck.

32.     Most investors in the Semi-Truck Option of the Equipment Program were required to make the investment through a new or existing corporation or limited liability company created and held by the investor (the "Investment Entity"), while some investors were permitted to own the truck in their personal name—regardless, the scheme, documents, and conduct were near identical. RBL claimed that the investor would be the legal owner of the semi-truck.

33.     Under the terms of the Semi-Truck Option of the Equipment Program, the investor agreed to lease the semi-truck to RBL for a five-year term. RBL then promised to pay the investor monthly lease payments in the amount of $3,000.00, which would begin on the third month and continue for fifty-eight months thereafter. At the end of the five-year term, an investor in the Semi-Truck Option of the Equipment Program would have received $174,000.00 in lease payments, representing a 216% return on investment. RBL also promised that the investor would fully own the truck at the end of the five-year term—meaning that the investor would have the opportunity to keep the semi-truck or sell the semi-truck to RBL or a third party.

34.     Investors also had the opportunity to invest $110,000.00 in the Semi-Truck Option of the Equipment Program to purchase two semi-trucks as opposed to only one. As an incentive to make that investment, RBL promised to pay investors a $10,000.00 "rebate" thirty days after

receipt of the investment. RBL promised to pay investors who chose the two-semi-truck option a monthly lease payment of $6,000.00 for fifty-eight months, after which the investor would fully own the trucks. At the end of that lease term, an investor would have received $358,000.00 in lease payments, representing an approximate 225% return on investment.

35.     Similarly, the near identical Trailer Sponsorship Option of the Equipment Program was a six-month program that offered investors the opportunity to sponsor the building and purchase of a tractor-trailer on behalf of RBL.

36.     The Trailer Sponsorship Option of the Equipment Program required a minimum investment of $50,000.00 with a maximum investment of $200,000.00. The Trailer Sponsorship Option had a 180-day term.

37.     Under the Trailer Sponsorship Option of the Equipment Program, RBL represented to investors that the investor's funds were used to build trailers in India, which were then disassembled and shipped to the United States. RBL represented that, upon arriving in the United States, the trailers were then reassembled and added to RBL's fleet or sold for a profit.

38.     At the end of the trailer sponsorship, RBL was represented that it would repay investors their principal investment plus thirty percent interest.

39.     As noted herein, RBL allowed investors to purchase any number of semi-trucks and/or trailers from RBL so long as the investors had the capital to do so.

40.     The governing documents, agreements, representations, circumstances, harm, and victims within the Equipment Program—even between and among the Trailer Sponsorship Option and the Semi-Truck Option of the Equipment Program—are common, typical, and virtually identical in substance.

ii.    The Loan Programs—Short- and Long-Term Investments

41.    As part of the Loan Scheme, RBL offered investors the opportunity to invest in RBL's business through a Short-Term Investment Program (the "Short-Term Option") and a Long-Term Investment Program (the "Long-Term Option") (the Short-Term Option and the Long-Term Option collectively, the "Loan Program").

42.    RBL represented to investors that investments in the Loan Program would be used in RBL's general business operations.

43.    RBL's Short-Term Option required a minimum investment of $25,000.00 with a maximum investment of $200,000.00.  The Short-Term Option had a term of 90 to 365 days depending on the investment amount.

44.    At the end of the Short-Term Option loan period, RBL promised to repay investors their principal investment plus interest ranging from 20% to 108%, depending on the investment and term selected by the investor.

45.    RBL's Long-Term Option required a minimum investment of $60,000.00 with a maximum investment of $250,000.00.  The Long-Term Option had a term of thirty-six months.

46.    RBL promised to pay investors in the Long-Term Option monthly payments based on a 12.5% annual interest rate.

47.    New investors typically began by investing $25,000.00 in the Short-Term Option, which was a teaser program designed to lure investors into making larger investments over longer periods of time.

48.    The investor agreements for the Loan Program are virtually identical in substance.

### B. RBL's Misstatements and Omissions

49.    RBL solicited investors for the Schemes through sales agents, promotional videos, in-person investor presentations, investor conferences, and word of mouth.

50.    Potential investors were provided with offering materials and a brochure, entitled "RBL Investor Plan," which described each of the two overarching Programs—again, the Equipment Program and the Loan Program—along with investment requirements and associated returns.

51.    Unbeknownst to the investors, RBL's representations about the success of RBL's trucking company, the safety and security of investor funds, the size of RBL's fleet, and RBL's ability to pay investor returns from the profitability of RBL's trucking enterprise were all false.

52.    In reality, RBL was using commingled investor funds to pay RBL's business expenses and, as further explained below, to make Ponzi scheme-like "interest" and "lease" payments and principal redemptions to investors in RBL's investment Programs.    Account balances were often reduced to a few hundred thousand dollars until new investor money was deposited, which allowed RBL to continue operating.  RBL repeated this vicious cycle over and over to the detriment of innocent investors.

53.    Moreover, RBL grossly overstated the number of trucks that it had purchased on behalf of investors in the Equipment Program.  The bulk of RBL's fleet was actually comprised of independent contractors who drove their *own trucks* for RBL.  To inflate the number of RBL's trucks to potential investors, RBL misrepresented the owner-operated trucks as RBL's own.  The semi-trucks that were actually purchased by RBL as part of the Equipment Program were approximately ten to twenty years old and in poor condition.  Some Equipment Program investors never even received the semi-trucks or trailers that they were promised.

54.     RBL also failed to disclose that RBL executives were misappropriating millions of dollars of investor funds for themselves or diverting such funds for unauthorized and speculative securities trading.

## C. RBL's Misuse and Misappropriation of Investor Funds

55.     During the Relevant Period, RBL used investor funds to make Ponzi scheme-like payments of "returns" and redemptions to investors.  Also during the Relevant Period, RBL executives misappropriated millions of dollars of investor funds for themselves or diverted such funds for trading on margin in speculative equities.

### i.     RBL's Operation of the Ponzi Scheme

56.     RBL no doubt operated the Schemes as a Ponzi scheme.

57.     RBL represented to prospective investors that it was able to pay the extraordinary returns promised to investors due to the rapid growth and success of RBL's trucking business.  In reality, RBL's bank records reflect that, from August 2019 through February 2023, RBL operated at an approximate $18 million loss *and used investor funds to cover the shortfall*.

58.     RBL's bank accounts, including the Citi Account, reflected that, in the absence of sufficient revenues, RBL had been conducting a Ponzi scheme to meet its obligations to investors.

59.     In classic Ponzi scheme fashion, RBL paid returns and redemptions to preexisting investors—either interest on the Loan Program or lease payments under the Equipment Program— with money raised entirely from new investors.  RBL was also using new investor funds to pay redemptions to preexisting investors because, without new investments, RBL had insufficient funds to pay investors.

60.     None of the Programs permitted RBL to engage in this scheme nor did RBL disclose to investors that RBL would be using investor money in this manner.

    ii.    <u>RBL's Diversion of Investor Funds to RBL Executives</u>

61.    From 2019 until the SEC uncovered the scheme and took RBL into receivership, RBL misappropriated *at least* $13.9 million of investor funds for RBL executives and related parties, which was neither disclosed to nor permitted by investors.

62.    None of the Programs permitted RBL to divert investor funds to executives nor did RBL disclose to investors that RBL would be using investor money in this manner.

    iii.    <u>RBL's Diversion of Investor Funds for Unauthorized Securities Trading</u>

63.    From March 2022 through January 2023, RBL diverted approximately $19.3 million of investor funds to two TD Ameritrade brokerage accounts.  The accounts were then used to engage in highly speculative trading of equities on margin, losing more than $1 million.

64.    Due to the volatility of the accounts, TD Ameritrade force-closed both accounts.

65.    None of the Programs permitted RBL to use investor funds for such trades, and RBL certainly did not disclose such use to investors.

**D.  RBL's Efforts to Scam Plaintiff**

66.    Plaintiff is held and managed by Kenson Dorestin ("Dorestin").

67.    Dorestin heard about RBL from members of his community and, like many others, was tricked into believing that he could make money by investing in RBL.

68.    Specifically, Plaintiff invested in the Equipment Program and, in turn, entered into various contracts with RBL for the purchase of two semi-trucks.  RBL lured Dorestin, through Plaintiff, with a guaranteed return on investment.

69.    On March 1, 2022, Plaintiff entered into an Investment & Equipment Operating Lease Agreement (the "Plaintiff 2022 Agreement").  A true and correct copy of the Plaintiff 2022 Agreement is attached hereto as **Exhibit 1**.  Pursuant to the terms of the Plaintiff 2022 Agreement,

Plaintiff paid RBL a $35,000.00 "Start-up Payment" in exchange for the promise of recurring rental payments and the ownership of a semi-truck after the five-year loan period. Exh. 1 § 2.

70.     Then, on February 6, 2023, Plaintiff entered into another Investment & Equipment Operating Lease Agreement (the "Plaintiff 2023 Agreement") (the Plaintiff 2022 Agreement and the Plaintiff 2023 Agreement collectively, the "Plaintiff Agreements"). A true and correct copy of the Plaintiff 2023 Agreement is attached hereto as **Exhibit 2**. Pursuant to the terms of the Plaintiff 2023 Agreement, Plaintiff paid RBL another $35,000.00 "Start-up Payment" in exchange for the promise of reoccurring rental payments and the ownership of a second semi-truck after the five-year loan period. Exh. 2 § 2.

71.     At least one of Plaintiff's investments was deposited by RBL into the Citi Account. Thus, Citi had control over Plaintiff's investment(s).

72.     The substance of the Plaintiff Agreements is virtually identical to the substance of the agreements of all other victims of the Equipment Scheme.

73.     As of the date of this Complaint, Plaintiff has zero semi-trucks and tens of thousands of dollars in outstanding investments to RBL that—if it were up to RBL—Plaintiff would never get back.

74.     Plaintiff's experience is identical to that of all other investors in the Programs.

75.     Plaintiff's story is just the beginning. RBL uniformly tricked more than 1,500 individuals into investing in the fake Programs with the promise of guaranteed returns in order to steal their money. Sadly, the actions of RBL addressed herein were uniform. RBL's actions were reasonably calculated to confuse or frustrate individuals and to knowingly deprive individuals of their investments.

**E.  Citi's Control Over the Schemes—Citi Played an Essential Role**

76.     Citi had actual knowledge of and directly participated in the Schemes.

77.     RBL's relationship with Citi began in October of 2021.

78.     On October 12, 2021, RBL submitted a Business Deposit Account Application ("Application") to Citi at a Citi branch in Tamarac, Florida, which was signed by RBL's President Sanjay Singh ("Sanjay").   A true and correct copy of the Application is attached hereto as **Exhibit 3**.  The Application also named Daniel Sejour ("Daniel"), RBL's Finance Manager, as an authorized signer.

79.     In the Deposit Product Selection section of the Application, Sanjay indicated that the "Intended Balance" of RBL's deposit account—which would serve as RBL's operating account (the Account)—would range from $250,000.00 to $500,000.00.  Therefore, Citi had actual knowledge of RBL's purported business model.  Exh. 3 at 1.

80.     The first several months of the banking relationship were relatively mundane, with RBL depositing approximately $10,000.00 and $100,000.00 in October and November 2021, respectively.

81.     The proceeding months were anything but mundane, however.  True and correct copies of RBL's Account statements for the Relevant Time Period are attached hereto as **Exhibit 4**.

82.     In December of 2021, the activity on the Account began to increase, with debits totaling approximately $250,000.00 and credits totaling $204,000.00.

83.     In January of 2022, Citi began leaving internal notes on the Account regarding irregular activity.  Specifically, as early as January 28, 2022, Citi blocked RBL's Account, noted

a "deposit risk," and initiated a "PND" or "Post No Debit," which likely restricted the account from all withdrawals, transfers, or other debits.

84.     The debits and credits of the Account also increased significantly in January 2022 to approximately $558,000.00 and $870,000.00, respectively.

85.     Then, on February 1, 2022, Citi entered a "FRAUD HIGH PRIORITY NOTE" on the Account, indicating that the PND would remain on the account.  Therefore, Citi first had actual knowledge of RBL's fraudulent conduct no later than February 1, 2022.  Yet, instead of closing the Account, Citi continued to act with control over the Account and assist RBL in effectuating the Schemes.

86.     The debits and credits continued to increase during the month of February 2022, both totaling just under $1 million.

87.     Notably, on February 3, 2022, Citibank entered another "FRAUD HIGH PRIORITY NOTE" that indicated that the deposit risk block had been removed by IRT,[5] but that the account had a "suspicious deposit," so bank employees had to "***please consider all deposits***." Notwithstanding this knowledge, the same internal note indicates "***no action needed***."  Therefore, Citi continued to have actual knowledge of RBL's fraudulent conduct on February 3, 2022.  Yet, instead of closing the Account, Citi continued to act with control over the Account and assist RBL in effectuating the Schemes.

88.     In March 2022, Account activity began to significantly increase and surpassed 400 transactions per month.   Debits ballooned to approximately $4,315,000.00, with credits of approximately $5,335,000.  The account balance at the end of March exceeded $1,375,000.00.

---

[5] Citi uses various acronyms, initialisms, and abbreviations in the account notes—many of which Plaintiff has been unable to decipher thus far.

89.     Citi placed various internal notes on the account in March 2022, including three "high priority" notes.  During this time, the bank began to internally note various returned deposited items ("RDI") and the reason for the return, such as insufficient funds.

90.     In April 2022, Account activity remained inflated with more than 400 transactions per month, debits of approximately $5,000,000.00, and credits near $5,500.000.00.  The Account balance at the end of April was nearly $2,000,000.00—almost four times the intended balance indicated on the Application and significantly more than had previously been held in the Account.

91.     Citibank placed various internal high priority and fraud notes throughout April 2022, with one specifically noting RBL had "RDI history."  Following this internal note, RBL had at least four additional RDI's in April.  A PND was also posted in April, which was later removed.  Therefore, Citi continued to have actual knowledge of RBL's fraudulent conduct in April 2022.  Yet, instead of closing the Account, Citi continued to act with control over the Account and assist RBL in effectuating the Schemes.

92.     In May 2022, Account activity continued at approximately 400 transactions per month, with the end-of-month balance falling to approximately $1,500,000.00.  However, debits and credits skyrocketed, with approximately $7,610,000.00 in debits and $7,250,000.00 in credits.  Throughout the month, Citibank placed various internal high priority notes for returned deposited items, with reasons ranging from insufficient funds to forgery.  Other internal notes related to returned deposited items indicate "refer to maker" or list no reason at all.  Therefore, Citi continued to have actual knowledge of RBL's fraudulent conduct in May 2022.  Yet, instead of closing the Account, Citi continued to act with control over the Account and assist RBL in effectuating the Schemes.

93.     Then, on May 28, 2022, Citibank blocked the Account altogether and indicated that no transactions were permitted.

94.     The internal notation that accompanied the block indicated that RBL had *fifteen* returned deposited items since the beginning of March.  Importantly, this note also indicated RBL was constantly "wiring out" and "depleting funds" upon deposit.  The internal note concluded with "***FIRST PARTY FRAUD – BLOCK ACCOUNT — REFER FOR CLOSURE***."

95.     Almost one month later, on June 27, 2022, the account was approved for closure. At the end of June 2022, the statements reflected a $0 balance in the business account, with statements reflecting withdrawals of approximately $1,555,000.00 from the account.

96.     Through it all, thanks to its intimate knowledge of RBL's claimed business and the reality of the transactions at its bank, Citi knew that the actual flow of funds through the Account was inconsistent with representations made by RBL regarding its business model.

97.     Citi recklessly ignored the fraudulent activity in the Account, once again signaling its bad-faith acceptance of and participation in the Schemes.  The funds invested by Plaintiff and other Class members were placed into this same Account.

98.     Had Citi properly exercised its absolute control, the Schemes would have been stifled from the start.  Instead, Citi reviewed and permitted the Schemes to occur and, even worse, actively participated in the Schemes and lent credence to the criminal acts of RBL.

**F.  The Appointment of the Receiver**

99.     As a direct result of the conduct alleged herein, the SEC filed a Complaint for Injunctive and Other Relief against RBL in the SEC Action.  The Court in the SEC Action granted the injunction and appointed a Receiver for RBL.  As of the date of this Complaint, the Receivership is still in place.

100.    As a result of Defendants' conduct, Plaintiff and members of the Class have suffered damages.

101.    Plaintiff has retained the undersigned law firm to represent it in this action and is obligated to pay counsel a reasonable fee for legal services.

## CLASS REPRESENTATION ALLEGATIONS

102.    Plaintiff brings this action pursuant to Florida Rules of Civil Procedure 1.220(b)(1)(B) and 1.220(b)(3), individually on behalf of itself and the Class of similarly situated individuals.  The "Class" is defined as:

> All (i) persons or entities in the United States, including all States, territories, protectorates, and federal districts (ii) who entered into an agreement with RBL of the same form or substantially similar form as Exhibits 1 and 2 (iii) whose investment was deposited into the Citi Account (iv) during the Relevant Period.

103.    Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

104.    Plaintiff reserves the right to establish sub-classes as appropriate.

105.    **Class Exclusions**: The following people are excluded from the Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) the legal representatives, successors, or assigns of any such excluded persons; and (5) Plaintiff's counsel, Defendants' counsel, and their respective immediate family members.

106.    **Numerosity:** Although Plaintiff does not know the exact size of the Class because said information is in the exclusive control of Defendants, it is evident that the Class is so numerous that joinder of all members into one action is impracticable.  Based upon the nature and scope of

the conduct involved herein and the information available from public records, the approximate number of Class members exceeds one thousand, and most of them are likely to be geographically dispersed throughout Florida, with some others geographically dispersed elsewhere in the United States.

107. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class in that proving Plaintiff's claims will simultaneously prove the claims of all Class members. Plaintiff and each Class member are victims of the Schemes alleged herein.  Plaintiff and all members of the Class were damaged by the same conduct of Defendants as complained of herein.

108. **Commonality**: Plaintiff and Class members' claims raise common factual and legal questions that can be answered for all Class members in a single Class-wide proceeding.  Questions of law and fact arising out of Defendants' conduct are common to all members of the Class.  For example, to adjudicate the claims, it would be necessary to resolve to following issues, each of which can be answered through common, generalized evidence:

    a.   whether RBL concocted a Ponzi scheme;

    b.   whether Citi had control over RBL's Ponzi scheme;

    c.   whether RBL breached its fiduciary duties to Plaintiff and Class members;

    d.   whether Citi aided and abetted RBL's breach of fiduciary duty;

    e.   whether RBL committed constructive fraud;

    f.   whether Citi aided and abetting RBL's constructive fraud;

    g.   whether RBL converted Plaintiff and the Class's investments;

    h.   whether Citi aided and abetted RBL's conversion;

    i.   whether Citi was unjustly enriched by Plaintiff and the Class's investments; and

      j.   whether Plaintiff and the Class suffered harm as a result of Defendants'

conduct.

109.   **Adequacy:** Plaintiff will fairly and adequately protect the interests of the Class and

has no interests that are antagonistic to the interests of Class members.  It is in Plaintiff's best

interest to prosecute the claims to obtain full redress due to it.  Plaintiff's interests do not conflict

with the interests of the Class because one or more questions of law and/or fact regarding liability

are common to all Class members, and, by prevailing on its own claims, Plaintiff necessarily will

establish Defendants' liability to other Class members.  Plaintiff has retained counsel experienced

in class action litigation and complex civil litigation to prosecute this action on behalf of the Class.

110.   **Superiority:** A class action is the superior procedural vehicle for the fair and

efficient adjudication of the claims asserted herein because common questions of law and fact

predominate over any individual questions that may arise, and significant economies of time,

effort, and expense will inure to the benefit of the Court and the parties in litigating the common

issues on a Class-wide basis instead of a repetitive, individual basis.  Many Class members'

individual damage claims are too small to make individual litigation an economically viable

alternative, and few Class members have an interest in individually controlling the prosecution of

a separate action.  Despite the relatively small size of many individual Class members' claims,

their aggregate volume, coupled with the economies of scale inherent in litigating similar claims

on a common basis, will enable this case to be litigated as a Class action on a cost-effective basis,

especially when compared with repetitive individual litigation.  Given the size of individual Class

members' claims, few Class members could afford to seek legal redress individually for the wrongs

Defendants committed against them.  When the liability of Defendants is adjudicated, claims of

all members of the Class can be determined by the Court.  This action will facilitate the orderly

and expeditious administration of the Class's claims, economies of time, effort, and expense will be fostered, and uniformity of outcome will be ensured.  Without a class action, the Class members will continue to suffer damages and Defendants' violations of law will proceed without remedy while Defendants continue to reap and retain the proceeds of its wrongful conduct.  No unusual difficulties are likely to be encountered in the management of this class action.  The forum is desirable because the acts or omissions giving rise to the claims pertained to the Account, which had a *situs* in Broward County, Florida.

111.   **Ascertainability:** Members of the Class can be identified and ascertained objectively through Defendants' records. Specifically, Plaintiff will be able to ascertain who invested in RBL during the Relevant Time Period and whose investments were deposited into the Citi Account.

112.   Plaintiff satisfies all prerequisites for suing as a representative party pursuant to Florida Rule of Civil Procedure 1.220.

### COUNT I[6]
### BREACH OF FIDUCIARY DUTY
(Against RBL)

Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 112 as if fully set forth herein.

113.   Plaintiff and Class members invested in RBL's Programs.  RBL promised Plaintiff and Class members that their investments would lead to guaranteed returns.

114.   RBL owed fiduciary duties of care, loyalty, and good faith to Plaintiff and Class members as investors in RBL.

---

[6] As noted *supra* at n.1, this Count is stayed in light of the injunction barring suits against RBL.

115.    Moreover, as an investor in RBL, and in light of the special relationship that existed between RBL and Plaintiff and Class members, a fiduciary duty also is imposed on RBL as a matter of law.

116.    RBL breached its duties of loyalty and good faith by, among other things, transferring Plaintiff and Class members' funds to other investors without the knowledge of Plaintiff or Class members just to keep the Schemes running smoothly, paying RBL executives with Plaintiff and Class members' funds without the knowledge of Plaintiff or Class members, and otherwise taking Plaintiff and Class members' investments with an intent to defraud Plaintiff and the Class members.

117.    Plaintiff and other Class members have been damaged by RBL's breach of its fiduciary duties.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment in their favor and against Royal Bengal Logistics Inc. for damages in the amount of all investments, together with interests and costs, and for such other relief as the Court may deem just and proper.

## COUNT II
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Citi)

Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 112 as if fully set forth herein.

118.    RBL owed fiduciary duties of care, loyalty, and good faith to Plaintiff and Class members as investors in RBL.

119.    Moreover, as an investor in RBL, and in light of the special relationship that existed between RBL and Plaintiff and Class members, a fiduciary duty also is imposed on RBL as a matter of law.

120.     RBL breached its duties of loyalty and good faith by, among other things, transferring Plaintiff and Class members' funds to other investors without the knowledge of Plaintiff or Class members just to keep the Schemes running smoothly, paying RBL executives with Plaintiff and Class members' funds without the knowledge of Plaintiff or Class members, and otherwise taking Plaintiff and Class members' investments with an intent to defraud Plaintiff and the Class members.

121.     At all times material hereto, Citi had knowledge of RBL's breaches of fiduciary duty and provided substantial assistance or encouragement in the wrongdoing permitted by the Ponzi schemer (RBL) to use Citi's banking platform to engage in the transactions that were the subject of the Schemes.

122.     As detailed above, Citi not only permitted the use of its platform despite knowledge of fraud, but also controlled, reviewed, and approved the fraudulent transactions.

123.     In other words, without the express approval of Citi, the bad acts at issue do not occur.

124.     Citi's knowledge of the Schemes can be seen by Citi's own internal notes on the Account.

125.     Citi also provided substantial assistance to RBL's breaches of fiduciary duty by permitting RBL to use Citi Account as a platform for RBL's improper misuse of funds.

126.     Citi's permittance of RBL's actions via the Account lent an air of legitimacy to RBL's investment solicitation activities.

127.     As a direct and proximate result of the foregoing, the investors (including Plaintiff and Class members) have suffered damages including the loss of assets as a result of the

transactions referenced herein, their increased/deepened insolvency, their increased liabilities, the loss and decrease in value of their assets, and/or corporate waste.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment in their favor and against Citibank, N.A. for damages in the amount of all investments, together with interests and costs, and for such other relief as the Court may deem just and proper.

### COUNT III[7]
### CONSTRUCTIVE FRAUD
(Against RBL)

Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 112 as if fully set forth herein.

128.    RBL had a duty to its investors (including Plaintiff and Class members) under a confidential or fiduciary relationship that was abused or, alternatively, RBL has taken unconscionable advantage of Plaintiff and Class members.

129.    Specifically, RBL owed fiduciary duties of care, loyalty, and good faith to Plaintiff and Class members as investors in RBL.

130.    Moreover, as an investor in RBL, and in light of the special relationship that existed between RBL and Plaintiff and Class members, a fiduciary duty also is imposed on RBL as a matter of law.

131.    RBL made numerous false statements concerning material facts to induce investors (including Plaintiff and Class members) to invest money into RBL.  Specifically, among other things, RBL promised investors (including Plaintiff and Class members) high return rates on their investments for the Loan Program and the prospect of owning a semi-truck or a trailer for the Equipment Program when, in reality, RBL was transferring Plaintiff and Class members' funds to

---

[7] As noted *supra* at n.1, this Count is stayed in light of the injunction barring suits against RBL.

other investors without the knowledge of Plaintiff or Class members just to keep the Schemes running smoothly, paying RBL executives with Plaintiff and Class members' funds without the knowledge of Plaintiff or Class members, and otherwise taking Plaintiff and Class members' investments with an intent to defraud Plaintiff and Class members.

132.    At the time RBL made the misrepresentations to investors (including Plaintiff and Class members), RBL knew or should have known that the representations were false due to RBL's superior knowledge of the way RBL intended to use the investments.

133.    As a direct and proximate result of the foregoing, the investors (including Plaintiff and Class members) have suffered damages including the loss of assets as a result of the transactions referenced herein, their increased/deepened insolvency, their increased liabilities, the loss and decrease in value of their assets, and/or corporate waste.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment in their favor and against Royal Bengal Logistics Inc. for damages in the amount of all investments, together with interests and costs, and for such other relief as the Court may deem just and proper.

## COUNT IV
## AIDING AND ABETTING CONSTRUCTIVE FRAUD
### (Against Citi)

Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 112 as if fully set forth herein.

134.    RBL had a duty to its investors (including Plaintiff and Class members) under a confidential or fiduciary relationship that was abused or, alternatively, RBL has taken unconscionable advantage of Plaintiff and Class members.

135.    Specifically, RBL owed fiduciary duties of care, loyalty, and good faith to Plaintiff and Class members as investors in RBL.

136.    Moreover, as an investor in RBL, and in light of the special relationship that existed between RBL and Plaintiff and Class members, a fiduciary duty also is imposed on RBL as a matter of law.

137.    RBL made numerous false and fraudulent statements concerning material facts to induce investors (including Plaintiff and Class members) to invest money into RBL.  Specifically, among other things, RBL promised investors (including Plaintiff and Class members) high return rates on their investments for the Loan Program and the prospect of owning a semi-truck or a trailer for the Equipment Program when, in reality, RBL was transferring Plaintiff and Class members' funds to other investors without the knowledge of Plaintiff or Class members just to keep the Schemes running smoothly, paying RBL executives with Plaintiff and Class members' funds without the knowledge of Plaintiff or Class members, and otherwise taking Plaintiff and Class members' investments with an intent to defraud Plaintiff and Class members.

138.    At all times material hereto, Citi had actual knowledge of and substantial control over the constructive fraud.

139.    At all times material hereto, Citi had knowledge of the ongoing transfer of the funds and provided substantial assistance or encouragement in the wrongdoing permitted by the Ponzi schemer (RBL) to use Citi's banking platform to engage in the transactions that were the subject of the Schemes.

140.    Citi's knowledge of the Schemes can be seen by Citi's own internal notes on the Account.

141.    Citi also provided substantial assistance to RBL's fraudulent transfers by permitting RBL to use the Citi Account as a platform for RBL's improper misuse of funds.

142.     Citi's express permittance of RBL's actions via the Account lent an air of legitimacy to RBL's investment solicitation activities.

143.     As detailed above, Citi not only permitted the use of its platform despite knowledge of fraud, but also controlled, reviewed, and approved the fraudulent transactions.

144.     In other words, without the express approval of Citi, the bad acts at issue do not occur.

145.     As a direct and proximate result of the foregoing, the investors (including Plaintiff and Class members) have suffered damages including the loss of assets as a result of the transactions referenced herein, their increased/deepened insolvency, their increased liabilities, the loss and decrease in value of their assets, and/or corporate waste.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment in their favor and against Citibank, N.A. for damages in the amount of all investments, together with interests and costs, and for such other relief as the Court may deem just and proper.

## COUNT V[8]
## CONVERSION
(Against RBL)

Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 112 as if fully set forth herein.

146.     Plaintiff and Class members all made investments in RBL.  RBL promised Plaintiff and Class members that their investment would lead to guaranteed returns.

147.     RBL converted the property of the investors (including Plaintiff and Class members) by engaging in multiple acts of dominion wrongfully asserted over property of such individuals and inconsistent with ownership in such property.

---

[8]  As noted *supra* at n.1, this Count is stayed in light of the injunction barring suits against RBL.

148.    Specifically, RBL wrongfully asserted dominion over investors' (including Plaintiff and Class members) investments in the Programs inconsistent with ownership therein.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment in its favor and against Royal Bengal Logistics Inc. for damages in the amount of all investments, together with interests and costs, and for such other relief as the Court may deem just and proper.

## COUNT VI
## AIDING AND ABETTING CONVERSION
(Against Citi)

Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 112 as if fully set forth herein.

149.    Plaintiff and Class members all made investments in RBL.  RBL promised Plaintiff and Class members that their investment would lead to guaranteed returns.

150.    RBL converted the property of the investors (including Plaintiff and Class members) by engaging in multiple acts of dominion wrongfully asserted over property of such individuals and inconsistent with its ownership in such property.

151.    Specifically, RBL wrongfully asserted dominion over investors' (including Plaintiff and Class members) investments in the Programs inconsistent with ownership therein.

152.    At all times material hereto, Citi had knowledge of the ongoing conversion of the funds and provided substantial assistance or encouragement in the wrongdoing permitted by the Ponzi schemer (RBL) to use Citi's banking platform to engage in the transactions that were the subject of the Schemes.

153.    Citi's knowledge of the Schemes can be seen by Citi's own internal notes on the Account.

154.    Citi also provided substantial assistance to RBL's conversion by permitting RBL to use the Citi Account as a platform for RBL's improper misuse of funds.

155.    Citi's permittance of RBL's actions via the Account lent an air of legitimacy to RBL's investment solicitation activities.

156.    As detailed above, Citi not only permitted the use of its platform despite knowledge of fraud, but also controlled, reviewed, and approved the fraudulent transactions.

157.    In other words, without the express approval of Citi, the bad acts at issue do not occur.

158.    Citi was aware of its role in RBL's scheme, as seen in Citi's own internal notes on the Account.

159.    As a direct and proximate result of the foregoing, the investors (including Plaintiff and Class members) have suffered damages including the loss of assets as a result of the transactions referenced herein, their increased/deepened insolvency, their increased liabilities, the loss and decrease in value of their assets, and/or corporate waste.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment in its favor and against Citibank, N.A. for damages in the amount of all investments, together with interests and costs, and for such other relief as the Court may deem just and proper.

## COUNT VII
## UNJUST ENRICHMENT
(Against Citi)

Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 112 as if fully set forth herein.

160.    Citi received a benefit when, during the course of the Schemes, RBL wrongfully caused investors (including Plaintiff and Class members) to transfer money to Citi.

161.    Citi knowingly and voluntarily accepted and retained a benefit in the form of those transfers.

162.    These benefits include, but are not limited to, interest, fees, charges, rebates, and other benefits associated with maintaining large deposit accounts.

163.    The circumstances as alleged herein render Citi's retention of that benefit inequitable and unjust, including to the investors (including Plaintiff and Class members) as a whole, so Citi must pay the investors the value of the benefit received.

164.    Citi has been unjustly enriched at the expense of the investors (including Plaintiff and Class members) in the amount of the transfers set forth herein.

165.    The investors (including Plaintiff and Class members) are entitled to the return of that money through disgorgement, restitution, or any other applicable remedy.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment in its favor and against Citibank, N.A. for the value of the benefits conferred on Citi, together with interests and costs, and for such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 30, 2024

Respectfully submitted,

ZEBERSKY PAYNE SHAW LEWENZ, LLP
110 SE 6th St., Suite 2900
Fort Lauderdale, Florida 33301
Telephone: (954) 989-6333
Facsimile: (954) 989-7781
Primary Emails: jshaw@zpllp.com;
zludens@zpllp.com; lpalen@zpllp.com
Secondary Emails: mlomastro@zpllp.com;
lgrealy@zpllp.com

By:  /s/ *Jordan A. Shaw*
     JORDAN A. SHAW, ESQ.
     Fla. Bar No. 111771
     ZACHARY D. LUDENS, ESQ.
     Fla. Bar No. 111620
     LAUREN N. PALEN, ESQ.
     Fla. Bar No. 1038877

# EXHIBIT 1

# INVESTMENT & EQUIPMENT OPERATING LEASE AGREEMENT

**THIS EQUIPMENT OPERATING AGREEMENT (this "Agreement") dated this 1st day of March, 2022, by and between:**

**LETIDAS LOGISTICS LLC: KENSON DORESTIN: 355 Bridgebrook Ln SW, Smyrna, GA. 30082**

(the "Lessor")

OF THE FIRST PART

**- AND –**

**Royal Bengal Logistics Inc, 9600 West Sample Rd Suite 100, Coral Springs FL-33065**

(the "Lessee")

OF THE SECOND PART

(the Lessor and Lessee are collectively the "Parties")

**IN CONSIDERATION OF** the mutual covenants and promises in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the Lessor leases the Equipment to the Lessee, and the Lessee leases the Equipment from the Lessor on the following terms:

*This Agreement contains italicized text which explains the terms of this contract and our reasoning for asking you to agree to those contract terms. In these sections, "Royal Bengal Logistics, Inc" is referred to as "we/our" and the Lessor is referred to as "you/your." If for some reason, we get into a dispute with you and a court of law is interpreting this contract, the italicized explanation is intended to be read together with the regular contract terms. If, however,*



# R B L

Royal Bengal Logistics, Inc.

*there is any conflict between the interpretation of the regular terms and the italicized explanation, the regular terms control our relationship.*

**Definitions**

§ 1.    The following definitions are used but not otherwise defined in this Agreement:

a. "Casualty Value" means the market value of the Equipment. When referring to the "Casualty Value" in relation to a "Total Loss," the Casualty Value shall be the market value immediately before the "Total Loss" and shall be determined by an appraisal by Lessee's insurance carrier.

b. "Equipment" means the tractor and trailer which is the subject of this Agreement, as more specifically identified in the "Equipment Addendum" at the time of purchase.

c. "Total Loss" means any loss or damage that is not repairable or that would cost more to repair than the market value of the Equipment.

d. "Business days" means a weekday (as opposed to a weekend) which is not a United States federal holiday or a day designated for the recognition of the federal holiday (*e.g.* New Year's Day, Christmas).

e. "Term" means the five-year period of this Operating Lease beginning **March 01, 2022**. If the Agreement is terminated prior to the conclusion of this five-year period, pursuant to the terms of this Agreement, the Term of the Agreement shall conclude at the time of termination.

f. "Finance Contract" means the contract between Lessor and a third party company for the purpose of financing the purchase of the Equipment.

**Start-up**

*For this Operating Lease Agreement, you will need to pay us $35,000 to get your business started. This initial payment will be used by us, in whole or in part for the process of acquiring a tractor and trailer (e.g. administrative costs, down payment) which we will lease from you. This is a nonrefundable payment, but we will return the payment (subtracted by any payments we made to you or on your behalf) if something goes wrong in the process of acquiring the tractor and trailer. For example, if after 12 months we cannot find a lender who will provide you financing on reasonable terms which we agree with and you have already sent you 10 payments of $2,500, then we will return to you the remainder $10,000.*

§ 2.    Lessor shall pay Lessee **$35,000** ("Start-up Payment"). The Start-up Payment is a material condition for Lessee to enter into this Agreement. The Start-up Payment is not refundable, however, Lessee shall return to Lessor the Start-up Payment, less any payments



# R B L

Royal Bengal Logistics, Inc.

already made to or on behalf of Lessor, if the Agreement is prematurely terminated prior to the purchase of the Equipment.

## Lease

**§ 3.**       The Lessor agrees to lease the Equipment to the Lessee, and the Lessee agrees to lease the Equipment from the Lessor in accordance with the terms set out in this Agreement.

**§ 4.**       The Agreement's Term commences on **March 01, 2022** and will continue until **March 01, 2027** unless otherwise terminated pursuant to the terms of this Agreement.  At the conclusion of the Term of this Agreement, Lessee shall no longer have any obligation to make lease payments to Lessor, and Lessee shall return the Equipment to Lessor.

## Lease Payment

*We will pay lease payments to you monthly, except for the month that we entered into this Agreement and the following month.  In total, we will pay you for a total of 58 payments (five years of payments [60] minus the first and second month) presuming that the Agreement is not terminated earlier.   We will try to get the lease payments into your account at the same time every month, but we may need up to five business days.  We don't expect to miss any payments, but if for any reason we miss a payment, just notify us by email at bdo@rbltransports.com and we will fix it quickly.  You will receive lease payments even if you have not yet purchased the tractor and trailer.*

**§ 5.**       Lessee shall pay Lessor the sum of **$2,500** ("Lease Payment") within 5 business days of the 1st day of each month during the Term of the Agreement, as described below.

      a.   Lessee shall not make any Lease Payment on the first or the second month of the Term of the Agreement.

      b.   If Lessee fails to make a Lease Payment as required by this section, Lessee shall have 5 business days to cure after the date which Lessor provides written notice of the missed Lease Payment.

## Acquisition of the Equipment

*This is an operating lease contract where we will lease from you a tractor and trailer that you have not purchased yet.  We will find a tractor and trailer which is suitable for our company, and do what we can to help you acquire financing for your purchase of the tractor and trailer.  Once we have helped you purchase your tractor and trailer, we will use them for our business for the remainder of the lease term.  Since we are using the tractor and trailer for our business and paying for it, it is important that we get to decide which tractor and trailer will become the*



# R B L

Royal Bengal Logistics, Inc.

*leased equipment. In exchange, we will pay you for the use of the tractor and trailer and we will make the financing payments for you. Presuming that this agreement has not been concluded prematurely, we will ultimately make all payments for the tractor and trailer, leaving you with a tractor and trailer in a condition in which it could be lawfully used in business.*

**§ 6.**      The Parties recognize that Lessor does not have possession of the Equipment as of **March 01, 2022** and that this Agreement is contingent upon Lessor's acquisition of the Equipment. The tractor and trailer comprising the Equipment may be purchased at separate times. The Parties agree to cooperate in good faith concerning the acquisition of the Equipment as follows:

> a.  Lessee shall identify Equipment available for sale from a third party which suits Lessee's business needs.

> b.  Lessee shall assist Lessor with obtaining financing through a third party lender. Lessor shall cooperate and assist with this process as necessary to acquire said financing.

> c.  Lessor shall enter into an agreement with the third party lender to provide financing for the purchase of the Equipment ("Finance Contract"). Lessee shall not be a party to the Finance Contract.

> d.  Lessor shall purchase the Equipment and provide the Equipment to Lessee for use during the Term of the Agreement.

> e.  Upon Lessor's request, the Lessee will execute and deliver to the Lessor documents required by the Lessor to protect the Lessor's interest in the Equipment including, but not limited to, the documents necessary to file a UCC financing statement.

*We want to enjoy a mutually beneficial relationship with you during this Operating Lease Agreement's five-year term, however, if something happens that prevents us from acquiring and using a tractor and trailer, we will have to terminate this Operating Lease Agreement and return what remains of your $35,000 start-up payment after subtracting money we paid to you (lease payments) or on your behalf.*

**§ 7.**      If Lessor fails, is unable, or refuses to comply with the terms listed in the preceding § 6, then Lessee shall have the option to terminate this Agreement. Reasons for termination include, but are not limited to:

> a.  If Lessee refuses to cooperate in the purchase or financing of the Equipment or refuses the terms of the sale or financing of the Equipment; and



# R B L

Royal Bengal Logistics, Inc.

      b. If Lessee cannot acquire financing to purchase the Equipment within the first 12 months of this Agreement.

**§ 8.** In the event that Lessee has elected to terminate this Agreement pursuant to the above § 7, Lessee shall return to Lessor the Startup Payment, subtracted by any Lease Payments paid to Lessor and any payment made on behalf of Lessor. These returned funds shall be provided to Lessee within 60 days of Lessee providing notice of the termination of the Agreement to Lessor.

**Financing of Equipment**

*While we will make all of the payments for the tractor and trailer (unless something goes wrong and our agreement is terminated early), you will be the party obtaining financing and agreeing to a financing contract to acquire the tractor and trailer. It is our goal to try to find you the best financing agreement with the most beneficial terms from a reputable lender. However, the financing contract will be between you and a lender who we do not control. We will not be reviewing the contract that you enter into.*

**§ 9.** Lessor shall finance and purchase the Equipment in its name, however, all payments to the third party lender pursuant to the Finance Contract shall be paid by Lessee during the Term of the Agreement.

**§ 10.** If the Finance Contract requires that payments be made beyond the 5-year term of this Agreement, Lessee shall continue to make payments until all payments have been made pursuant to the Financing Contract.

**§ 11.** Lessor is under no obligation to agree to the terms of the Financing Contract provided by the third party lender. Upon Lessor's request, Lessee will take reasonable measures in a good faith attempt to find an alternative third-party lender which is acceptable to Lessor. However, if Lessor cannot acquire financing for the Equipment with payment terms that are agreed to by Lessee, based on Lessee's sole discretion, Lessee may terminate the Agreement pursuant to the above § 7.

**§ 12.** Lessor releases Lessee from any liability related to the acquisition of financing, the Finance Contract, or actions or omissions committed by the third party lender.

**Use of the Equipment**

*It is critical that we be able to use the tractor and trailer while we are leasing it. If you do something that interferes with our ability to use the tractor and trailer, we may need to conclude this Operating Lease Agreement.*



# R B L

Royal Bengal Logistics, Inc.

**§ 13.**    Lessor shall permit Lessee to use the Equipment during the Term.  This use shall include, but not limited to, the transportation of goods for the benefit of Lessee's business. Accordingly,

>    a.   Lessor shall not sell or otherwise convey the Equipment or the title of the Equipment to any other party during the Term of the Agreement;

>    b.   Lessor shall not interfere with the use of the Equipment during the Term. This includes inspections or other interruptions of Lessee's business; and

>    c.   Lessor shall not encumber or otherwise use the Equipment or the title of the Equipment as collateral/security for any purpose other than the Finance Contract.

If Lessor violates this section and it prevents Lessee from the use of the Equipment during the Term, Lessor may terminate this Agreement and shall no longer have any obligation to make Lease Payment or the payments required under the Finance Contract, in addition to any other remedy lawfully available to Lessee.

**Lessee's Care for the Equipment**

*We will do our best to take care of the tractor and trailer while it is in our care.  If something goes wrong and something happens to your tractor and trailer, we will fix it.   When our Operating Lease Agreement has concluded, we will make sure to give you a vehicle in good enough condition that you could operate it as part of a trucking business.*

**§ 14.**    The Lessee shall exercise reasonable care in the use of the Equipment and shall maintain the Equipment with reasonable care and will comply with all applicable law. The Lessee will, at the Lessee's own expense, keep the Equipment in good repair, appearance, and condition.    Lessee shall have no obligation to repair or otherwise remedy damages arising from wear and tear which may accrue during the normal use of the Equipment (minor dents, tire wear, etc.), so long as the Equipment is in a condition which can pass a Department of Transportation inspection for the commercial transportation of goods.

**§ 15.**    Unless the Lessee obtains the prior written consent of the Lessor, the Lessee will not alter, modify or attach anything to the Equipment unless the alteration, modification or attachment is easily removable without damaging the functional capabilities or economic value of the Equipment.

**§ 16.**    Lessee warrants that the Equipment will be in good working order and good condition upon delivery to Lessor after the completion of the Term or termination of the Agreement.



# R B L

Royal Bengal Logistics, Inc.

## Relationship with Seller and Lender

*If a problem comes up concerning the sale or financing of the tractor and trailer, we might need to work with the seller or the lender. Because you are the purchaser of the tractor and trailer and borrowed money for that transaction, the seller and lender might not want to work with us unless you give us permission to speak with them. Accordingly, you agree to let us speak to the seller or lender to resolve such disputes.*

§ 17.    Lessor appoints Lessee as a designated representative for the purpose of enforcing any warranty, guarantee, or promise made concerning the sale of the Equipment. Lessor agrees to cooperate with Lessee as needed for that purpose.

§ 18.    Lessor appoints Lessee as a designated representative for the purpose of communicating with the Finance Contract lender or resolving any dispute with the Finance Contract lender. Lessor agrees to cooperate with Lessee as needed for that purpose.

## Risk of Damage to the Equipment

*We are responsible for your tractor and trailer while we have it in our possession. If your tractor and trailer are damaged in our possession, we will fix it (other than normal wear and tear).*

§ 19.    Lessee shall bear the risk of loss concerning the Equipment, including but not limited to loss arising from theft, damage, or destruction to the Equipment from any and every cause.

§ 20.    In the event of Total Loss of the Equipment, Lessee and Lessor shall confer in good faith to evaluate the best method for the Parties to continue doing business together. In the event no agreement can be reached, Lessee shall purchase Equipment with substantially the same value and condition as the Equipment was, immediately prior to the incident which resulted in the Total Loss. In such a circumstance, this Agreement shall continue to be in force, as if the replacement Equipment had always been the Equipment identified in the Equipment Addendum in this Agreement.

## Insurance

*While we have your tractor and trailer, we will make sure that it is insured with a policy limit of at least $1,000,000.*

§ 21.    The Lessee will, during the Term and while Lessee possess the Equipment, maintain and pay for insurance against loss of and damage to the Equipment for the full replacement value of the Equipment and will name Lessor as the loss payee. While Lessee possesses the Equipment during the Term, Lessee shall maintain and pay for comprehensive



# R B L

Royal Bengal Logistics, Inc.

general liability insurance against claims for bodily injury, including death, and property damage or loss arising out of the use of the Equipment. **The insurance policy will have limits of at least $1,000,000.** The insurance will be in the joint name of the Lessor and the Lessee so that both the Lessor and the Lessee are protected by the policy. The insurance policy shall have a provision that it will not be modified or canceled unless the insurer provides the Lessor with thirty (30) days written notice stating when such modification or cancellation will be effective. Upon written demand by the Lessor, the Lessee shall provide the Lessor with an original policy or certificate evidencing such insurance.

## Taxes

*We are going to take care of whatever taxes are owed for the purchase and use of the tractor and trailer. We are not going to pay any taxes (such as income taxes) that you owe because of payments we make to you.*

**§ 22.**  The Lessee will report and pay all taxes, fees, and tax penalties associated with the purchase and use of the Equipment during the Term. However, Lessee shall have no obligation to pay taxes, fees, and tax penalties which arise from any income or other benefit received by Lessor pursuant to this Agreement (*e.g.* income taxes).

**§ 23.**  If the Lessee fails to pay any taxes, fees, and charges, as required by this Agreement and Lessor, on behalf of Lessee, pays the same, Lessee shall reimburse Lessor for the cost upon notification from the Lessor of the amount.

## Indemnity

*We will ensure that you do not have to pay if something happens with your tractor and trailer (like a vehicle accident) and someone tries to hold you responsible as the owner of the vehicle.*

**§ 24.**  The Lessee will indemnify and hold harmless the Lessor against any and all claims, actions, suits, proceedings, costs, expenses, damages and liabilities, including attorney's fees and costs, arising from Lessee's use of the Equipment during the Term. Lessee's responsibility to indemnify the Lessor under this section may be satisfied in whole or in part by proceeds or other benefits provided by insurance.

## Right of First Refusal

*At the end of the term of the Operating Lease Agreement, you can do whatever you want to do with your tractor and trailer. However, if you are going to sell the tractor and trailer, we want to have a chance to buy it before you sell it to someone else. For the first year after our agreement is concluded, you will give us an opportunity to purchase the tractor and trailer before you sell it to someone else. Before any potential sale of the tractor and trailer, you will tell us what price you intend to sell it for and give us an opportunity to buy it for the same price. If we refuse the*



# R B L

Royal Bengal Logistics, Inc.

*offer or do not respond within two weeks, you can go ahead and sell the tractor and trailer to someone else.*

§ 25.    At the conclusion of the Term of this Agreement and for a period of one year thereafter, Lessor shall not sell or otherwise convey the Equipment to a potential purchaser without first providing Lessee with the opportunity to purchase the Equipment from Lessor under the same material terms as those contemplated by the potential purchaser. Accordingly, prior to entering into any agreement concerning the sale or conveyance of the Equipment, Lessor shall first provide notice to Lessee of a prospective sale or conveyance and this notice shall include all material terms of a prospective sale or conveyance. Lessee shall have 14 days to evaluate and determine whether it will purchase the Equipment under those same terms. If Lessee refuses or does not respond within 14 days, Lessor may sell or otherwise convey the Equipment under those same terms to a third party purchaser.

## Entire Agreement

§ 26.    This Agreement will constitute the entire agreement between the Parties. Any prior understanding or representation of any kind preceding the date of this Agreement will not be binding on either Party except to the extent incorporated in this Agreement.

## Address for Notice

§ 27.    Service of all notices under this Agreement will be delivered personally or sent by registered mail or courier to the following addresses:

Lessor: **LETIDAS LOGISTICS LLC: KENSON DORESTIN: 355 Bridgebrook Ln SW, Smyrna, GA. 30082**

Lessee: **Royal Bengal Logistics; 9600 WEST SAMPLE RD SUITE 100 CORAL SPRINGS FL 33067**

## Governing Law

*We are a Florida company with a headquarters in Broward County, Florida. It makes sense for any dispute between us should be determined here. This Operating Lease Agreement was drafted with the intention that Florida law would apply. Accordingly, to fulfill our intentions, Florida law will apply to any dispute between us.*

§ 28.    This Agreement shall be interpreted under Florida law. Any dispute arising between the Parties shall be governed by Florida law. The exclusive jurisdiction for any lawsuit or other dispute resolution process between the Lessee and Lessor shall be brought and heard in Broward County, Florida, unless the applicable court does not have personal jurisdiction over a necessary party.

9



**R B L**

Royal Bengal Logistics, Inc.

## Severability

*We do not believe that there is anything unlawful about our agreement, but a court might disagree. This agreement shall be enforced as it is written to the extent possible, even if a court ultimately determines that there is anything unlawful about it.*

**§ 29.**      In the event that any provision or term of this Agreement is determined to be unenforceable, invalid, or otherwise unlawful, the remainder of the Agreement shall nevertheless be enforced as if there had not been any unlawful provision or term of the Agreement.

   **§ 30.**      If any provision or term of this Agreement is determined to be unlawful, as described in the above § 29 *and* that provision or term can be limited or truncated in such a way as to cause the provision or term to lawful and still substantially fulfill the intent of the parties, as reflected in the text of this Agreement, then an enforcing court shall so enforce this limited or truncated provision or term as if it had always been part of the Agreement (aka "blue-penciling").

## *"Force Majeure"*

*In the unlikely event that a catastrophic event occurs, either one of us might not be able to do what we promise to do in our agreement. Accordingly, you agree that neither of us will claim damages for a delay caused by a catastrophic event. If something so catastrophic happens that we cannot even use your tractor and trailer anymore, we may need to conclude our agreement to lease your tractor and trailer. If so, we will make sure that you have received at least twice the amount you provided as a start-up payment.*

   **§ 31.**      Neither Party shall be liable in damages for any delay or default in performance if such delay or default is caused by conditions beyond its control including, but not limited to Acts of God, Government restrictions, acts of war or terrorism, disease pandemics, civil disturbances, utility malfunction, natural disasters, such as earthquakes, hurricanes or floods and/or any other cause beyond the reasonable control of the Party whose performance is affected.

   **§ 32.**   If any event described in the above § 31 makes it impossible or prohibitively difficult for Lessee to continue doing business with the Equipment, the Parties shall confer in good faith about the best way for the Parties to proceed, considering the circumstances. If no agreement can be reached, the Agreement shall be terminated. Lessee shall return the



**R B L**

Royal Bengal Logistics, Inc.

Equipment to Lessor and shall have no further obligation to make Lease Payments or make payments pursuant to the Finance Contract. If Lessor has not received at least double the amount it originally provided as a Start-up Payment (considering both the Lease Payments and payments made by Lessee to the lender on Lessor's behalf) at the time of the termination of the Agreement, as described in this section, then Lessee shall pay to Lessor a sum of money equal to double the Start-up Payment subtracted by the total amount of funds Lessee paid to Lessor as Lease Payments and the payments Lessee made to the lender on Lessor's behalf.

## Assignment

*We may want another legal entity to use the tractor and trailer while we are leasing them from you. To ensure that there is no legal technicality preventing us from doing that, you agree to permit us to assign the right to use your tractor and trailer. This won't change our contractual obligations to you, such as our obligation to make payments to you and your lender (if any) or return your tractor and trailer to you.*

**§ 33.**     Lessee may assign to a third party Lessee's right to use the Equipment. Lessee's assignment, pursuant to this section, shall not absolve or release Lessee of responsibility or liability arising from the terms of this Agreement.   Lessor shall not assign any rights or responsibilities pursuant to this Agreement without the express written consent of Lessee.

**[Continued on the following page]**

11



# **R B L**
Royal Bengal Logistics, Inc.

**IN WITNESS WHEREOF-** The Parties have duly affixed their signatures under hand and seal on this **1st day of March, 2022.**

 

Lessor - **LETIDAS LOGISTICS LLC: 355 Bridgebrook Ln SW, Smyrna, GA. 30082**

**KENSON DORESTIN**
Its Authorized Agent

 

**Lessee – Royal Bengal Logistics, Inc.**

9600 W Sample Rd Suite 100, Coral Springs, FL 33065

**CO. AGENT**
Its Authorized Agent

_____ (Witness)

_____ (Witness)

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY



# R B L

Royal Bengal Logistics, Inc.

## EQUIPMENT ADDENDUM

The "Equipment," as referred to in the March 1, 2022   Investment & Operating Lease Agreement, has been identified as:

[_____] with the approximate value of $[_____]

VIN # _____PENDING

        SO AGREED, this 1ST day of MARCH, 2022:

                               **Lessor- LETIDAS LOGISTICS LLC: 355 Bridgebrook Ln SW, Smyrna, GA. 30082**

                               **KENSON DORESTIN**
                               Its Authorized Agent

13

# **EXHIBIT 2**

# INVESTMENT & EQUIPMENT OPERATING LEASE AGREEMENT

**THIS EQUIPMENT OPERATING AGREEMENT (this "Agreement") dated this February 6, 2023, by and between:**

**LETIDAS LOGISTICS INC: KENSON DORESTIN: 1420 Blair Bridge Road, Austell, GA 30168**

("Lessor")

OF THE FIRST PART

- AND –

**Royal Bengal Logistics: 9600 WEST SAMPLE RD, SUITE 100, CORAL SPRINGS, FL 33065**

("Lessee")

OF THE SECOND PART

(Lessor and Lessee are collectively the "Parties")

**IN CONSIDERATION OF** the mutual covenants and promises in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, Lessor leases the Equipment to Lessee, and Lessee leases the Equipment from Lessor on the following terms:

> *This Agreement contains italicized text which explains the terms of this contract and our reasoning for asking you to agree to those contract terms. In these sections, "Royal Bengal Logistics, Inc" is referred to as "we/our" and Lessor is referred to as "you/your." If for some reason, we get into a dispute with you and a court of law is interpreting this contract, the italicized explanation is intended to be read together with the regular contract terms. If, however, there is any conflict between the interpretation of the regular terms and the italicized explanation, the regular terms control our relationship.*



## Definitions

**§ 1.** The following definitions are used but not otherwise defined in this Agreement:

    a. "Casualty Value" means the market value of the Equipment.  When referring to the "Casualty Value" in relation to a "Total Loss," the Casualty Value shall be the market value immediately before the "Total Loss" and shall be determined by an appraisal by Lessee's insurance carrier.

    b. "Equipment" means the tractor and/or trailer which is the subject of this Agreement, as more specifically identified in the "Equipment Addendum" at the time of purchase.

    c. "Total Loss" means any loss or damage that is not repairable or that would cost more to repair than the market value of the Equipment.

    d. "Business days" means a weekday (as opposed to a weekend) which is not a United States federal holiday or a day designated for the recognition of the federal holiday (*e.g.* New Year's Day, Christmas).

    e. "Term" means the five-year period of this Operating Lease beginning February 6, 2023.  If the Agreement is terminated prior to the conclusion of this five-year period, pursuant to the terms of this Agreement, the Term of the Agreement shall conclude at the time of termination.

    f. "Finance Contract" means the contract between Lessor and a third party company for the purpose of financing the purchase of the Equipment.

## Start-up

> *For this Operating Lease Agreement, you will need to pay us $35,000 to get your business started. This initial payment will be used by us, in whole or in part, for the process of acquiring a tractor (e.g. administrative costs, down payment) which we will lease from you. This is a nonrefundable payment, but we will return the payment (subtracted by any payments we made to you or on your behalf) if something goes wrong in the process of acquiring the equipment. For example, if after 12 months we cannot find a lender who will provide you financing on reasonable terms which we agree with and have already sent you 10 payments of $2,500, then we will return to you the remainder.*

**§ 2.** Lessor shall pay Lessee $35,000 ("Start-up Payment").  The Start-up Payment is a material condition for Lessee to enter into this Agreement.  The Start-up Payment is not refundable, however, Lessee shall return to Lessor the Start-up Payment, less any payments already made to or on behalf of Lessor, if the Agreement is prematurely terminated prior to the purchase of the Equipment.



**RBL**
ROYAL BENGAL LOGISTICS, INC.

**Lease**

**§ 3.**     Lessor agrees to lease the Equipment to Lessee, and Lessee agrees to lease the Equipment from Lessor in accordance with the terms set out in this Agreement.

**§ 4.**     The Agreement's Term commences on **February 6, 2023** and will continue until **February 6, 2028** unless otherwise terminated pursuant to the terms of this Agreement.  At the conclusion of the Term of this Agreement, Lessee shall no longer have any obligation to make lease payments to Lessor, and Lessee shall return the Equipment to Lessor.

**Lease Payment**

> *We will pay lease payments to you monthly, except for the month that we entered into this Agreement and the following month.  In total, we will pay you for a total of 58 payments (five years of payments [60] minus the first and second month) presuming that the Agreement is not terminated earlier.   We will try to get the lease payments into your account at the same time every month, but we may need up to five business days.  We don't expect to miss any payments, but if for any reason we miss a payment, just notify us by email at **bdo@rbltransports.com** and we will fix it quickly.  You will receive lease payments even if you have not yet purchased the tractor and trailer.*

**§ 5.**     Lessee shall pay Lessor the sum of $2,500 ("Lease Payment") within 7-10 business days of the 6th day of each month during the Term of the Agreement, as described below.

> a.   Lessee shall not make any Lease Payment on the first or the second month of the Term of the Agreement, payments will begin April 6, 2023.
>
> b.   If Lessee fails to make a Lease Payment as required by this section, Lessee shall have 7-10 business days to cure after the date which Lessor provides written notice of the missed Lease Payment.



## Acquisition of the Equipment

> *This is an operating lease contract where we will lease from you a tractor that you have not purchased yet. We will find equipment which is suitable for our company, and do what we can to help you acquire financing for your purchase of the tractor. Once we have helped you purchase your equipment, we will use it for our business for the remainder of the lease term. Since we are using the equipment for our business and paying for it, it is important that we get to decide which tractor will become the leased equipment. In exchange, we will pay you for the use of the equipment and we will make the financing payments for you. Presuming that this agreement has not been concluded prematurely, we will ultimately make all payments for the tractor, leaving you with equipment in a condition in which it could be lawfully used in business.*

§ 6. The Parties recognize that Lessor does not have possession of the Equipment as of, February 6, 2023 and that this Agreement is contingent upon Lessor's acquisition of the Equipment. The tractor and trailer comprising the Equipment may be purchased at separate times. The Parties agree to cooperate in good faith concerning the acquisition of the Equipment as follows:

    a. Lessee shall identify Equipment available for sale from a third party which suits Lessee's business needs. In Lessee's discretion, a trailer may be part of the Equipment.

    b. Lessee shall assist Lessor with obtaining financing through a third party lender. Lessor shall cooperate and assist with this process as necessary to acquire said financing.

    c. Lessor shall enter into an agreement with the third party lender to provide financing for the purchase of the Equipment ("Finance Contract"). Lessee shall not be a party to the Finance Contract.

    d. Lessor shall purchase the Equipment and provide the Equipment to Lessee for use during the Term of the Agreement.

    e. Upon Lessor's request, Lessee will execute and deliver to Lessor documents required by Lessor to protect Lessor's interest in the Equipment including, but not limited to, the documents necessary to file a UCC financing statement.

> *We want to enjoy a mutually beneficial relationship with you during this Operating Lease Agreement's five-year term. however, if something happens that prevents us from acquiring and using a tractor and trailer. we will have to terminate this Operating Lease Agreement and return what remains of your start-up payment after subtracting money we paid to you (lease payments) or on your behalf.*



**§ 7.**    If Lessor fails, is unable, or refuses to comply with the terms listed in the preceding § 6, then Lessee shall have the option to terminate this Agreement.  Reasons for termination include, but are not limited to:

    a.  If Lessee refuses to cooperate in the purchase or financing of the Equipment or refuses the terms of the sale or financing of the Equipment; and

    b.  If Lessee cannot acquire financing to purchase the Equipment within the first 12 months of this Agreement.

**§ 8.**    In the event that Lessee has elected to terminate this Agreement pursuant to the above § 7, Lessee shall return to Lessor the Startup Payment, subtracted by any Lease Payments paid to Lessor and any payment made on behalf of Lessor.  These returned funds shall be provided to Lessee within 60 days of Lessee providing notice of the termination of the Agreement to Lessor.

**Financing of Equipment**

> *While we will make all of the payments for the equipment (unless something goes wrong and our agreement is terminated early), you will be the party obtaining financing and agreeing to a financing contract to acquire the tractor. It is our goal to try to find you the best financing agreement with the most beneficial terms from a reputable lender. However, the financing contract will be between you and a lender who we do not control. We will not be reviewing the contract that you enter into.*

**§ 9.**    Lessor shall finance and purchase the Equipment in its name, however, all payments to the third party lender pursuant to the Finance Contract shall be paid by Lessee during the Term of the Agreement.

**§ 10.**    If the Finance Contract requires that payments be made beyond the 5-year term of this Agreement, Lessee shall continue to make payments until all payments have been made pursuant to the Financing Contract.

**§ 11.**    Lessor is under no obligation to agree to the terms of the Financing Contract provided by the third party lender.  Upon Lessor's request, Lessee will take reasonable measures in a good faith attempt to find an alternative third-party lender which is acceptable to Lessor.  However, if Lessor cannot acquire financing for the Equipment with payment terms that are agreed to by Lessee, based on Lessee's sole discretion, Lessee may terminate the Agreement pursuant to the above § 7.

**§ 12.**    Lessor releases Lessee from any liability related to the acquisition of financing, the Finance Contract, or actions or omissions committed by the third party lender.



## Use of the Equipment

> *It is critical that we be able to use the tractor while we are leasing it. If you do something that interferes with our ability to use the equipment, we may need to conclude this Operating Lease Agreement.*

**§ 13.** Lessor shall permit Lessee to use the Equipment during the Term. This use shall include, but not limited to, the transportation of goods for the benefit of Lessee's business. Accordingly,

    a. Lessor shall not sell or otherwise convey the Equipment or the title of the Equipment to any other party during the Term of the Agreement;

    b. Lessor shall not interfere with the use of the Equipment during the Term. This includes inspections or other interruptions of Lessee's business; and

    c. Lessor shall not encumber or otherwise use the Equipment or the title of the Equipment as collateral/security for any purpose other than the Finance Contract.

If Lessor violates this section and it prevents Lessee from the use of the Equipment during the Term, Lessor may terminate this Agreement and shall no longer have any obligation to make Lease Payment or the payments required under the Finance Contract, in addition to any other remedy lawfully available to Lessee.

## Lessee's Care for the Equipment

> *We will do our best to take care of the tractor and trailer while it is in our care. If something goes wrong and something happens to your tractor and trailer, we will fix it. When our Operating Lease Agreement has concluded, we will make sure to give you a vehicle in good enough condition that you could operate it as part of a trucking business.*

**§ 14.** Lessee shall exercise reasonable care in the use of the Equipment and shall maintain the Equipment with reasonable care and will comply with all applicable law. Lessee will, at Lessee's own expense, keep the Equipment in good repair, appearance, and condition. Lessee shall have no obligation to repair or otherwise remedy damages arising from wear and tear which may accrue during the normal use of the Equipment (minor dents, tire wear, etc.), so long as the Equipment is in a condition which can pass a Department of Transportation inspection for the commercial transportation of goods.

**§ 15.** Unless Lessee obtains the prior written consent of Lessor, Lessee will not alter, modify or attach anything to the Equipment unless the alteration, modification or attachment is easily removable without damaging the functional capabilities or economic value of the Equipment.

**§ 16.** Lessee warrants that the Equipment will be in good working order and good condition upon delivery to Lessor after the completion of the Term or termination of the



Agreement.  If Lessor did not purchase a trailer because Lessee did not elect to include trailer as part of the Equipment or because Lessor was unable to acquire financing for a trailer, then a trailer will not be provided to Lessor at the completion of the Term.

**Relationship with Seller and Lender**

> *If a problem comes up concerning the sale or financing of the tractor and trailer, we might need to work with the seller or the lender.  Because you are the purchaser of the tractor and trailer and borrowed money for that transaction, the seller and lender might not want to work with us unless you give us permission to speak with them.  Accordingly, you agree to let us speak to the seller or lender to resolve such disputes.*

**§ 17.**     Lessor appoints Lessee as a designated representative for the purpose of enforcing any warranty, guarantee, or promise made concerning the sale of the Equipment.  Lessor agrees to cooperate with Lessee as needed for that purpose.

**§ 18.**     Lessor appoints Lessee as a designated representative for the purpose communicating with the Finance Contract lender or resolving any dispute with the Finance Contract lender.  Lessor agrees to cooperate with Lessee as needed for that purpose.

**Risk of Damage to the Equipment**

> *We are responsible for your tractor and trailer while we have it in our possession.  If your tractor and trailer are damaged in our possession, we will fix it (other than normal wear and tear).*

**§ 19.**     Lessee shall bear the risk of loss concerning the Equipment, including but not limited to loss arising from theft, damage, or destruction to the Equipment from any and every cause.

**§ 20.**     In the event of Total Loss of the Equipment, Lessee and Lessor shall confer in good faith to evaluate the best method for the Parties to continue doing business together.  In the event no agreement can be reached, Lessee shall purchase Equipment with substantially the same value and condition as the Equipment was, immediately prior to the incident which resulted in the Total Loss.  In such a circumstance, this Agreement shall continue to be in force, as if the replacement Equipment had always been the Equipment identified in the Equipment Addendum in this Agreement.

**Insurance**

> *While we have your tractor and trailer, we will make sure that it is insured with a policy limit of at least $1,000,000.*

**§ 21.**     Lessee will, during the Term and while Lessee possess the Equipment, maintain and pay for insurance against loss of and damage to the Equipment for the full replacement value of the Equipment and will name Lessor as the loss payee. While Lessee possesses the Equipment during the Term, Lessee shall maintain and pay for comprehensive general



liability insurance against claims for bodily injury, including death, and property damage or loss arising out of the use of the Equipment. **The insurance policy will have limits of at least $1,000,000.** The insurance will be in the joint name of Lessor and Lessee so that both Lessor and Lessee are protected by the policy. The insurance policy shall have a provision that it will not be modified or canceled unless the insurer provides Lessor with thirty (30) days written notice stating when such modification or cancellation will be effective. Upon written demand by Lessor, Lessee shall provide Lessor with an original policy or certificate evidencing such insurance.

**Taxes**

> *We are going to take care of whatever taxes are owed for the purchase and use of the tractor and trailer. We are not going to pay any taxes (such as income taxes) that you owe because of payments we make to you.*

**§ 22.**      Lessee will report and pay all taxes, fees, and tax penalties associated with the purchase and use of the Equipment during the Term. However, Lessee shall have no obligation to pay taxes, fees, and tax penalties which arise from any income or other benefit received by Lessor pursuant to this Agreement (*e.g.* income taxes).

**§ 23.**      If Lessee fails to pay any taxes, fees, and charges, as required by this Agreement and Lessor, on behalf of Lessee, pays the same, Lessee shall reimburse Lessor for the cost upon notification from Lessor of the amount.

**Indemnity**

> *We will ensure that you do not have to pay if something happens with your tractor and trailer (like a vehicle accident) and someone tries to hold you responsible as the owner of the vehicle.*

**§ 24.**      Lessee will indemnify and hold harmless Lessor against any and all claims, actions, suits, proceedings, costs, expenses, damages and liabilities, including attorney's fees and costs, arising from Lessee's use of the Equipment during the Term. Lessee's responsibility to indemnify Lessor under this section may be satisfied in whole or in part by proceeds or other benefits provided by insurance.

**Right of First Refusal**

> *At the end of the term of the Operating Lease Agreement, you can do whatever you want to do with your tractor and trailer. However, if you are going to sell the tractor and trailer, we want to have a chance to buy it before you sell it to someone else. For the first year after our agreement is concluded, you will give us an opportunity to purchase the tractor and trailer before you sell it to someone else. Before any potential sale of the tractor and trailer, you will tell us what price you intend to sell it for and give us an opportunity to buy it for the same price. If we refuse the offer or do not respond within two weeks, you can go ahead and sell the tractor and trailer to someone else.*



§ 25.    At the conclusion of the Term of this Agreement and for a period of one year thereafter, Lessor shall not sell or otherwise convey the Equipment to a potential purchaser without first providing Lessee with the opportunity to purchase the Equipment from Lessor under the same material terms as those contemplated by the potential purchaser. Accordingly, prior to entering into any agreement concerning the sale or conveyance of the Equipment, Lessor shall first provide notice to Lessee of a prospective sale or conveyance and this notice shall include all material terms of a prospective sale or conveyance. Lessee shall have 14 days to evaluate and determine whether it will purchase the Equipment under those same terms.  If Lessee refuses or does not respond within 14 days, Lessor may sell or otherwise convey the Equipment under those 35 same terms to a third party purchaser.

## Entire Agreement

§ 26.    This Agreement will constitute the entire agreement between the Parties. Any prior understanding or representation of any kind preceding the date of this Agreement will not be binding on either Party except to the extent incorporated in this Agreement.

## Address for Notice

§ 27.    Notices under this Agreement will be delivered personally or sent by registered mail or courier to the following addresses:

Lessor: **LETIDAS LOGISTICS INC: KENSON DORESTIN: 1420 Blair Bridge Road, Austell, GA 30168; k.dorestin@gmail.com**

Lessee: **Royal Bengal Logistics: 9600 WEST SAMPLE RD, SUITE 100, CORAL SPRINGS, FL 33067**

## Governing Law

> *We are a Florida company with a headquarters in Broward County, Florida.  It makes sense for any dispute between us should be determined here.  This Operating Lease Agreement was drafted with the intention that Florida law would apply.  Accordingly, to fulfill our intentions, Florida law will apply to any dispute between us.*

§ 28.    This Agreement shall be interpreted under Florida law.  Any dispute arising between the Parties shall be governed by Florida law.  The exclusive jurisdiction for any lawsuit or other dispute resolution process between Lessee and Lessor shall be brought and heard in Broward County, Florida, unless the applicable court does not have personal jurisdiction over a necessary party.

## Severability

> *We do not believe that there is anything unlawful about our agreement, but a court might disagree.  This agreement shall be enforced as it is written to the extent possible, even if a court ultimately determines that there is anything unlawful about it.*

§ 29.    In the event that any provision or term of this Agreement is determined to be



unenforceable, invalid, or otherwise unlawful, the remainder of the Agreement shall nevertheless be enforced as if there had not been any unlawful provision or term of the Agreement.

**§ 30.**    If any provision or term of this Agreement is determined to be unlawful, as described in the above § 29 *and* that provision or term can be limited or truncated in such a way as to cause the provision or term to lawful and still substantially fulfill the intent of the parties, as reflected in the text of this Agreement, then an enforcing court shall so enforce this limited or truncated provision or term as if it had always been part of the Agreement (aka "blue-penciling").

*"Force Majeure"*

> *In the unlikely event that a catastrophic event occurs, either one of us might not be able to do what we promise to do in our agreement. Accordingly, you agree that neither of us will claim damages for a delay caused by a catastrophic event. If something so catastrophic happens that we cannot even use your tractor and trailer anymore, we may need to conclude our agreement to lease your tractor and trailer. If so, we will make sure that you have received at least twice the amount you provided as a start-up payment.*

**§ 31.**    Neither Party shall be liable in damages for any delay or default in performance if such delay or default is caused by conditions beyond its control including, but not limited to Acts of God, Government restrictions, acts of war or terrorism, disease pandemics, civil disturbances, utility malfunction, natural disasters, such as earthquakes, hurricanes or floods and/or any other cause beyond the reasonable control of the Party whose performance is affected.

**§ 32.**  If any event described in the above § 31 makes it impossible or prohibitively difficult for Lessee to continue doing business with the Equipment, the Parties shall confer in good faith about the best way for the Parties to proceed, considering the circumstances. If no agreement can be reached, the Agreement shall be terminated. Lessee shall return the Equipment to Lessor and shall have no further obligation to make Lease Payments or make payments pursuant to the Finance Contract. If Lessor has not received at least double the amount it originally provided as a Start-up Payment (considering both the Lease Payments and payments made by Lessee to the lender on Lessor's behalf) at the time of the termination of the Agreement, as described in this section, then Lessee shall pay to Lessor a sum of money equal to double the Start-up Payment subtracted by the total amount of funds Lessee paid to Lessor as Lease Payments and the payments Lessee made to the lender on Lessor's behalf.



**Assignment**

> *We may want another legal entity to use the tractor and trailer while we are leasing them from you. To ensure that there is no legal technicality preventing us from doing that, you agree to permit us to assign the right to use your tractor and trailer. This won't change our contractual obligations to you, such as our obligation make payments to you and your lender (if any) or return your tractor and trailer to you.*

**§ 33.** Lessee may assign to a third party Lessee's right to use the Equipment. Lessee's assignment, pursuant to this section, shall not absolve or release Lessee of responsibility or liability arising from the terms of this Agreement. Lessor shall not assign any rights or responsibilities pursuant to this Agreement without the express written consent of Lessee.

**Compliance Requirements**

> *Leases of commercial trucks have certain required terms that must be included (49 C.F.R. §§ 376.11, et seq.). The terms in this section are intended to comply with these requirements.*

**§ 34.** Lessee shall provide written notice by email to Lessor when Lessee takes possession of the Equipment. Upon Lessee's request, Lessor shall provide written notice of the return of the Equipment at the conclusion of the Term.

**§ 35.** During the Lease Term, Lessee shall have exclusive possession, control, and use of the Equipment.

**§ 36.** At the conclusion of the Term, Lessee shall remove from the Equipment any identification device before the Equipment is returned to Lessor.

**§ 37.** The cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses shall be borne by Lessee. Lessor has no responsibility to load or unload any equipment. Lessee shall not deduct from Lessor's compensation the purchase of any items. Lessor is not required to purchase or rent any products, equipment, or services from Lessee.



**IN WITNESS WHEREOF**- The parties have duly affixed their signatures under hand and seal on this **6th day of February, 2023.**

**Lessor-  LETIDAS LOGISTICS INC:**

**1420 Blair Bridge Road, Austell, GA 30168**

_____

**KENSON DORESTIN**
Its Authorized Agent

**Lessee – ROYAL BENGAL LOGISTICS:**

9600 W Sample Rd Suite 100, Coral Springs, FL 33065

_____

**CO. AGENT NAME**
Its Authorized Agent

_____ (Witness)

_____ (Witness)



## EQUIPMENT ADDENDUM

The "Equipment," as referred to in the February 6, 2023  Investment & Operating Lease Agreement, has been identified as:

[_____] with the approximate value of $[_____]

VIN # [_____]

SO AGREED, this 6th day of February, 2023:

**Lessor - LETIDAS LOGISTICS INC:**
**1420 Blair Bridge Road, Austell, GA**
**30168**

_____

**KENSON DORESTIN**

Its Authorized Agent

NOT AN OFFICIAL COPY – PUBLIC ACCESS NOT AN OFFICIAL COPY

# **EXHIBIT 3**

# Business Deposit Account Application



## Business Information

| Business Name | Doing Business As/DBA *(if applicable)* |
|---|---|
| Royal Bengal Logistics, Inc | |

**Business Entity Type *(Select One)***
☒ Corporation   ☐ Unincorporated Association   ☐ Public Entity
☐ Partnership (General, limited or Law)   ☐ Limited Liability Company   ☐ Business Trust
☐ Limited Liability Partnership   ☐ Sole Proprietorship

**Is the Entity a Not-For-Profit/Non-Government Organization?**
☐ Yes   ☒ No

| Tax Identification Number | Type of Tax ID *(Select One)* | Business Start Date |
|---|---|---|
| ▉7134 | ☐ Social Security Number   ☒ Employer ID Number | 06/08/2018 |

| Number of Locations | Annual Gross Revenue | Annual Net Profit | Number of Employees/Agents |
|---|---|---|---|
| 1 | $ 3000000 | $ 434000 | 80 |

| Business Phone | Business Fax | Is Business Home Based? |
|---|---|---|
| 510 342 6770 | | ☐ Yes   ☒ No |

**Business Industry/Activity/Description**
Transportation logistics general freight in the USA

Is this entity effectively controlled or owned by another entity that issues bearer shares?   ☐ Yes   ☒ No

| Primary Contact Name | Primary Contact Phone | Primary Contact Email |
|---|---|---|
| Sanjay Singh | 510 342 6770 | admin@rbltransports.com |

## Physical Address

| Street Number | Street Name | | |
|---|---|---|---|
| 9600 | W Sample Road | | |

| Suite/Mailstop/etc. *(if applicable)* | City | State | Zip |
|---|---|---|---|
| Suite 100 | Coral Springs | FL | 33065 |

## Mailing Address *(if different than above)*

| Street Number | Street Name | | |
|---|---|---|---|
| | | | |

| Suite/Mailstop/etc. *(if applicable)* | City | State | Zip |
|---|---|---|---|
| : | | | |

## Deposit Product Selection (Complete all fields for each account requested. Add additional pages, if needed.)

### Account 1

**Product *(Select One)***   ☒ Checking Account   ☐ Savings Account   ☐ Money Market Account   ☐ Certificate of Deposit (CD)

**Intended Balance *(Select One)***
☐ Under $25,000   ☒ $250,000–$500,000
☐ $25,000–$50,000   ☐ $500,000–$1 million
☐ $50,000–$250,000   ☐ Greater than $1 million

**Source of Initial Deposit *(Select all that apply)***
☐ Cash/Currency   ☒ Check from Existing Bank
☐ Citibank Account   ☐ Wire from Existing Bank
☐ Other _____

**Purpose of Account *(Select all that apply)***
☒ Operating   ☐ Savings   ☐ Payroll   ☐ Investment   ☐ Petty Cash   ☐ Other _____

**Checking Account Type**
☐ Streamlined
☒ Flexible
☐ CitiBusiness®
☐ Interest Checking

**CD Maturity Options *(if applicable)***
CD Term: _____
☐ Roll over CD at maturity
☐ Transfer principal and interest at maturity to account #: _____

**CD Interest Options *(if applicable)***
☐ Interest at maturity *(terms less than 1 year)*
☐ Post to Account
☐ Post Interest to Account #: _____
☐ Mail check to account address

### Account 2

**Product *(Select One)***   ☐ Checking Account   ☐ Savings Account   ☐ Money Market Account   ☐ Certificate of Deposit (CD)

**Intended Balance *(Select One)***
☐ Under $25,000   ☐ $250,000–$500,000
☐ $25,000–$50,000   ☐ $500,000–$1 million
☐ $50,000–$250,000   ☐ Greater than $1 million

**Source of Initial Deposit *(Select all that apply)***
☐ Cash/Currency   ☐ Check from Existing Bank
☐ Citibank Account   ☐ Wire from Existing Bank
☐ Other _____

**Purpose of Account *(Select all that apply)***
☐ Operating   ☐ Savings   ☐ Payroll   ☐ Investment   ☐ Petty Cash   ☐ Other _____

**Checking Account Type**
☐ Streamlined
☐ Flexible
☐ CitiBusiness®
☐ Interest Checking

**CD Maturity Options *(if applicable)***
CD Term: _____
☐ Roll over CD at maturity
☐ Transfer principal and interest at maturity to account #: _____

**CD Interest Options *(if applicable)***
☐ Interest at maturity *(terms less than 1 year)*
☐ Post to Account
☐ Post Interest to Account #: _____
☐ Mail check to account address

## Deposit Only Cards

☐ Please Issue Deposit Only Card(s)   How Many?: _____

©2019 Citibank, N.A. Member FDIC. Citi with Arc Design and other marks used herein are service marks of Citigroup Inc. or its affiliates, used and registered throughout the world. All rights reserved.
(Eff. 10/2019)

NOT AN OFFICIAL COPY — PUBLIC ACCESS — NOT AN OFFICIAL COPY

# Business Deposit Account Application


citi

**Account Activity–Select Yes or No for each question. If any "Yes", then complete Addendum A for each account on the application.**

| | | |
|---|---|---|
| Will you provide check cashing services (i.e. offer cash back from checks you receive), foreign currency services, money transmission services or sell financial instruments such as money orders, travelers checks, reloadable Debit Cards (such as Visa/MC/AmEx) or single-use cards totaling more than $1,000? | ☐ Yes | ☒ No |
| Will you send or receive wires to/from countries outside of the United States? | ☒ Yes | ☐ No |
| Will you deposit or withdraw more than $40,000 in cash, travelers checks or money orders each month? | ☐ Yes | ☒ No |
| Will you hold or transact any funds in this account that belong to one or more of your customers and are not part of your business' operating funds? (e.g., Will any funds be held as an investment for a client, or used to settle funds similar to an investment service  or trust arrangement?) | ☐ Yes | ☒ No |

**Signer Information–Complete for each signer. If more than 4 signers, then add Signer Personal Information form.**

| | | |
|---|---|---|
| Do any owners own 10% or more of the business but are not signers on the account? *(complete Addendum B if "Yes")* | ☐ Yes | ☒ No |

## Signer 1

| First Name | MI | Last Name | | Suffix | Date of Birth |
|---|---|---|---|---|---|
| Sanjay | | Singh | | | ▮1979 |

| Business Title | Email Address | Telephone Number | % Company Owned |
|---|---|---|---|
| President | admin@rbltransports.com | 5103426770 | 100 |

| First School Attended | Mother's Maiden Name | Social Security Number/ITIN* | Issue Card: |
|---|---|---|---|
| National High Scool | Sdevi | ▮▮▮▮5364 | ☒ Debit ☐ ATM ☐ None |

**Citizenship (Select One)**  
☒ US Citizen   ☐ Non Resident Alien (NRA)  
☐ Resident Alien ☐ Permanent Resident Alien (PRA)  
If Resident Alien or NRA or PRA, then complete A and B below:  
A. Countries of Citizenship: UNITED STATES  
B. Is Signer a Senior Public Figure (SPF) or related to an SPF? ☐ Yes ☒ No

| Identification – Type | State | Number | Issue Date | Expiration Date |
|---|---|---|---|---|
| drivers license | fl | ▮▮▮▮8090 | 08/21/2014 | 08/29/2022 |

## Signer 2

| First Name | MI | Last Name | | Suffix | Date of Birth |
|---|---|---|---|---|---|
| Daniel | | Sejour | | | ▮1984 |

| Business Title | Email Address | Telephone Number | % Company Owned |
|---|---|---|---|
| Finance Manager | daniel.s@rbltransports.com | 954 317 8210 | 0 |

| First School Attended | Mother's Maiden Name | Social Security Number/ITIN* | Issue Card: |
|---|---|---|---|
| contantin | piercin | ▮▮▮▮8034 | ☒ Debit ☐ ATM ☐ None |

**Citizenship (Select One)**  
☒ US Citizen   ☐ Non Resident Alien (NRA)  
☐ Resident Alien ☐ Permanent Resident Alien (PRA)  
If Resident Alien or NRA or PRA, then complete A and B below:  
A. Countries of Citizenship: UNITED STATES  
B. Is Signer a Senior Public Figure (SPF) or related to an SPF? ☐ Yes ☒ No

| Identification – Type | State | Number | Issue Date | Expiration Date |
|---|---|---|---|---|
| drivers license | fl | ▮▮▮▮3500 | 09/17/2019 | 09/30/2027 |

## Signer 3

| First Name | MI | Last Name | | Suffix | Date of Birth |
|---|---|---|---|---|---|
| | | | | | |

| Business Title | Email Address | Telephone Number | % Company Owned |
|---|---|---|---|
| | | | |

| First School Attended | Mother's Maiden Name | Social Security Number/ITIN* | Issue Card: |
|---|---|---|---|
| | | | ☐ Debit ☐ ATM ☐ None |

**Citizenship (Select One)**  
☐ US Citizen   ☐ Non Resident Alien (NRA)  
☐ Resident Alien ☐ Permanent Resident Alien (PRA)  
If Resident Alien or NRA or PRA, then complete A and B below:  
A. Countries of Citizenship:  
B. Is Signer a Senior Public Figure (SPF) or related to an SPF? ☐ Yes ☐ No

| Identification – Type | State | Number | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

## Signer 4

| First Name | MI | Last Name | | Suffix | Date of Birth |
|---|---|---|---|---|---|
| | | | | | |

| Business Title | Email Address | Telephone Number | % Company Owned |
|---|---|---|---|
| | | | |

| First School Attended | Mother's Maiden Name | Social Security Number/ITIN* | Issue Card: |
|---|---|---|---|
| | | | ☐ Debit ☐ ATM ☐ None |

**Citizenship (Select One)**  
☐ US Citizen   ☐ Non Resident Alien (NRA)  
☐ Resident Alien ☐ Permanent Resident Alien (PRA)  
If Resident Alien or NRA or PRA, then complete A and B below:  
A. Countries of Citizenship:  
B. Is Signer a Senior Public Figure (SPF) or related to an SPF? ☐ Yes ☐ No

| Identification – Type | State | Number | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

*Foreign govt issued ID required for NRA in lieu of SSN/ITIN

©2019 Citibank, N.A. Member FDIC. Citi, Citi with Arc Design and other marks used herein are service marks of Citigroup Inc. or its affiliates, used and registered throughout the world. All rights reserved.
(Eff. 10/2019)

# Business Deposit Account Application



## Account Agreement and Authorization (To be completed by customer only)

By signing below, I acknowledge and agree both individually, as applicable, and on behalf of the business identified in this application (the "Business"): (1) that I have received and agree to be bound by any agreement governing any account and service for which I am applying for within including the terms and conditions of the CitiBusiness® Client Manual and Schedule of Fees and Charges; (2) Citibank may obtain credit reports and make other inquiries it deems appropriate about both the Business and me individually; (3) any signer identified within this application may open additional accounts and enter into contracts for banking services on behalf of the Business; (4) and if I am a plan sponsor and/or plan fiduciary and the plan is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), by opening an account covered in this application, I have reviewed the CitiBusiness ERISA Section 408(b)(2)Disclosure Document made available to me reasonably in advance of my decision to open the account and that after my review, I made an independent decision that the fees and other compensation are reasonable for the services being provided by Citibank. I further consent to Citibank updating or changing the Disclosure Document by posting updated documents and/or notices at *http://citi.com/investorinfo/ advisoryprivacy/408b2disclosures.html* and that I am responsible for checking the website periodically for such updates.

## Tax Certification – Additional Documentation Required to Avoid Tax Withholding

In accordance with requirements of the Internal Revenue Code, I understand that my business must supply Citibank with a properly-executed tax certification form to establish U.S. Person or non-U.S. Person status for U.S. tax information reporting purposes. To comply with such requirement, my business will provide an executed IRS Form W-9 or Form W-8, as appropriate. If a validly executed IRS Form W-9 or Form W-8 is not provided, I understand that Citibank will implement backup withholding on interest earned on my business account(s) immediately upon account opening. Such backup withholding will continue to apply until the appropriate validly-executed tax certification form is provided. If this occurs, I understand that Citibank may not be able to refund the withheld taxes.

Forms W-9 and W-8 and associated instructions can be obtained on the IRS Forms and Publications website, the link for which is:

http://www.irs.gov/Forms-&-Pubs

| | |
|---|---|
| Sanjay  Singh | X |
| Print First and Last Name | Authorized Signature |
| President | 10/12/2021 |
| Business Title (Capacity Acting In) | Date |
| | X |
| Print First and Last Name | Authorized Signature |
| | 10/12/2021 |
| Business Title (Capacity Acting In) | Date |

NOT AN OFFICIAL COPY – PUBLIC RECORDS – NOT AN OFFICIAL COPY

---

### Bank Use Only

| Linking-List Related Account | Card Access | | |
|---|---|---|---|
| ☐ Safety Check ☐ Statement | Card Access for signers designated in signer section? | ☒ Yes | ☐ No |
| ☐ Account Analysis | Primary Account linked to Card? | ☐ Yes | ☐ No |
| Account Officer – Print Name | Phone Number | | |
| Tricia Cross | 9548126083 | | |

| PRINT | SAVE | CLEAR |
|---|---|---|

# BUSINESS—GENERAL DEPOSIT RESOLUTION



☒ Corporation   ☐ Limited Liability Company (LLC)   ☐ Partnership   ☐ Limited Liability Partnership (LLP)   ☐ Unincorporated Association

Business Name

Royal Bengal Logistics, Inc

Doing Business As/DBA (if applicable)

**Authorization-** The business identified in this Business Resolution (the "Business") acknowledges that all accounts now or hereafter established under this Business Resolution shall be governed by the rules and regulations of Citibank, N.A. (the "Bank") including those set forth in the Bank's CitiBusiness© Client Manual, receipt of which is hereby acknowledged, and applicable state and federal laws. The Bank reserves the right to change its rules and regulations from time to time.

Each person who signs this Business Resolution is authorized, on behalf of the Business, to open deposit accounts at the Bank, sign checks and other orders with respect to any funds to the credit of the Business and to give the Bank instructions to withdraw funds, to endorse and deposit checks and other items that are payable or belonging to the Business and to otherwise transact on all accounts of the Business in any manner permitted by the Bank. In addition, each such person individually is authorized to assign, transfer or pledge any property of the Business,  on behalf of the Business, to execute indemnities, assignments, receipts and other documents, to contract for and use online and mobile banking  and various cash management services (and delegate authority to transact upon accounts to designated persons using such services) and to conduct any and all other lawful business with the Bank.

The Business agrees that the Bank assumes no responsibility for the payment of a check, draft or other item drawn on or execution of a funds transfer or other debit instruction against any  account of the Business or for any withdrawal from any account which is honored and bears only a single signature of or is otherwise authorized by one of the individuals designated below. The Bank may rely on this authorization for each account of the Business until the Bank receives written notice revoking the authorization at the office where the account is maintained and until the Bank has had a reasonable time to act on such notice.

The Bank is authorized to pay any check, draft or other instrument for the payment of money drawn on any account of the Business which bears or appears to bear the signature or facsimile signature provided below or such other signature later certified to the Bank  to be authorized by the Business, if such signature, regardless of how or by whom affixed, resembles a specimen signature provided to the Bank.

If the Limited Liability Company (LLC) box is checked, the person executing this Business Resolution on behalf of the Business (the "Undersigned") certifies that the manager(s) or all members with banking authority have signed below. If the Partnership or LLP box is checked, the Undersigned certifies that the persons whose names appear below are the owners as co-partners and constitute all general partners with banking authority of the above-mentioned partnership. The Undersigned certifies to the Bank that the Undersigned has taken all actions and obtained all authorizations, consents and approvals as are necessary to the Undersigned's authority to execute this Resolution on behalf of the Business and in such capacity as is required by the Business.

| Print First and Last Name | Signature/Facsimile Signature |
|---|---|
| Sanjay  Singh | X |
| Daniel  Sejour | X |
|  | X |
|  | X |
|  | X |
|  | X |

RESOLVED, that this Business establish one or more deposit accounts with the Bank and that this Business adopts for each account the Authorization above. RESOLVED, that the person(s) whose name(s) appear above are each authorized, acting singly to establish and operate for this Business one or more accounts now and additional accounts from time to time, and to designate persons to perform transactions with respect to each account. I certify that this Business Resolution was adopted by this Business in accordance with applicable law and its charter, bylaws or other organizational documents, and is now in full force and effect. I further certify that all of the signatures are originals or the actual facsimiles used when issuing or negotiating checks.

| If entity is... | Corporation LLC Partnership/LLP Unincorporated Association | ...then the Signature of the... | Secretary or President or CEO Member or Manager or President Partner President or Secretary or Treasurer | ... or other such authorized person is required. |
|---|---|---|---|---|

X

Signature

Sanjay  Singh

Print First and Last Name

10/12/2021

Date

©2019 Citibank, N.A. Member FDIC. Citi, Citi with Arc Design and other marks used herein are service marks of Citigroup Inc. or its affiliates, used and registered throughout the world. All rights reserved

1193617  9885  02:12

PRINT   SAVE   CLEAR

## CitiBusiness®



| Financial Center # | 0058 | Marketplace | 016 | Current Date | 10/12/2021 |
|---|---|---|---|---|---|

| Tax ID | ███ 7134 |
|---|---|

| Business Name | Royal Bengal Logistics, Inc |
|---|---|

| Account # (S) | Print First and Last Name | Signature |
|---|---|---|
| ███ | Signer 1: Sanjay Singh | X _[signature]_ |
| ███ | Signer 2: Daniel Sejour | X _[signature]_ |
| | Signer 3: | X _____ |
| | Signer 4: | X _____ |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## CitiBusiness®



| Financial Center # | 0058 | Marketplace | 016 | Current Date | 10/12/2021 |
|---|---|---|---|---|---|

| Tax ID | ███ 7134 |
|---|---|

| Business Name | Royal Bengal Logistics, Inc |
|---|---|

| Account # (S) | Print First and Last Name | Signature |
|---|---|---|
| ███ | Signer 1: Sanjay Singh | X _[signature]_ |
| ███ | Signer 2: Daniel Sejour | X _[signature]_ |
| | Signer 3: | X _____ |
| | Signer 4: | X _____ |

© 2014 Citibank, N.A., Member FDIC. Citi with Arc Design and CitiBusiness are registered service marks of Citigroup Inc.
(Eff. 10/20/12)

1/0492  9886  04/4

# Beneficial Ownership Declaration
For All Clients Excluding Sole Proprietors

## Section A: Company Information

**Company Name:** Royal Bengal Logistics, Inc

To Whom It May Concern:

The following details are provided to Citibank, N.A. ("Citibank") by the above named company regarding the beneficial ownership structure of the Company.

## Section B: Individuals

Details are provided below for the following individuals with actual ownership in the Company or effective control over the Company. Please complete all fields for each individual listed.

- Owners
- Controlling Persons
- Authorized Signers

*Please Note: Refer to page 5 for the requirements of each of these individuals. Also, note that the first individual provided below should be the FinCEN Designated Controlling Person.*

*Section 1 may be left blank if the Company is Exempt from the FinCEN CDD Rule*

### 1.

| % of Ownership or Contribution | First Name | | MI | Last Name | | Suffix | Date of Birth | | SSN/ITIN |
|---|---|---|---|---|---|---|---|---|---|
| 100 | Sanjay | | | Singh | | | ▮/1979 | | ▮364 |

| Residential Address: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Street Number | Street Name | | | Apartment/Floor/ Units | | City | | State | Zip |
| 3700 | NW 109th Ave | | | | | Coral Springs | | FL | 33065 |

| Citizenship | | | Country of Citizenship | Country of Residence | Senior Public Figure (SPF)* or Related to SPF?* | Role/Business Title | Association |
|---|---|---|---|---|---|---|---|
| ☑ US Citizen | ☐ Permanent Resident: Alien (PRA) | | UNITED STATES | UNITED STATES | ☐ Yes  ☐ No | President | ☑ FinCEN Designated Controlling Person |
| ☐ Resident Alien (RA) | ☐ Non-Resident Alien (NRA) | | | | | | |

*Below only required if Account Signer = No and Citizenship = NRA*

| Identification Type | | First Name | State | Number | MI | Last Name | Issue Date | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| drivers license | | | fl | ▮3090 | | | 08/21/2014 | 09/29/2022 |

### 2.

| % of Ownership or Contribution | First Name | | MI | Last Name | | Suffix | Date of Birth | | SSN/ITIN |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Residential Address: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Street Number | Street Name | | | Apartment/Floor/ Units | | City | | State | Zip |
| | | | | | | | | | |

| Citizenship | | | Country of Citizenship | Country of Residence | Senior Public Figure (SPF)* or Related to SPF?* | Role/Business Title | Association |
|---|---|---|---|---|---|---|---|
| ☐ US Citizen | ☐ Permanent Resident; Alien (PRA) | | | | ☐ Yes  ☐ No | | ☐ Controlling Person |
| ☐ Resident Alien (RA) | ☐ Non-Resident Alien (NRA) | | | | | | ☐ Authorized Signer |

*Below only required if Account Signer = No and Citizenship = NRA*

| Identification Type | | First Name | State | Number | MI | Last Name | Issue Date | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

NOT AN OFFICIAL COPY – PUBLIC RECORD



# Beneficial Ownership Declaration
For All Clients Excluding Sole Proprietors

citi

## Section C: Entities

Details are provided below for other entities within the chain of ownership in our Company. Additionally, a diagram of our ownership structure is provided in Section D:

| | Entity Name | % of Ownership/ Contribution | Full Address of Primary Business Location or Registered Address | Country of Formation or Incorporation | Association to the Client | Entity Type |
|---|---|---|---|---|---|---|
| 1. | | | | | | ☐ Business Trust or PIC⁴<br>☐ Private Company²<br>☐ Publicly Traded⁵<br>☐ Government |
| 2. | | | | | | ☐ Business Trust or PIC⁴<br>☐ Private Company²<br>☐ Publicly Traded⁵<br>☐ Government |
| 3. | | | | | | ☐ Business Trust or PIC⁴<br>☐ Private Company²<br>☐ Publicly Traded⁵<br>☐ Government |

List 100% of the owners of the PIC, or Contributors to the Business Trust, in Section B.
² Less than 50% shares traded on a recognized exchange. List only owner of the Private Company, whose indirect ownership in the account is 10% or more, in Section B.
³ "50%+ shares traded on a covered exchange, e.g., NYSE or NASDAQ.

## Section D: For Multi-Layered Entities Only

In the space below, or on a separate document, please provide a diagram of your complete ownership structure, including all layers (example shown below).

### Multi-Layered Entity Example:



©2021 Citibank, N.A. Member FDIC. Citi, Citi with Arc Design and other marks used herein are service marks of Citigroup Inc. or its affiliates, used and registered throughout the world. All rights reserved.
(Eff. 5/2021)

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

# Beneficial Ownership Declaration
For All Clients Excluding Sole Proprietors



## Section E: Bearer Shares (Bearer Shares: negotiable instruments that accord ownership of a company to the person who possesses the share certificates, which are not registered and do not contain the name of the shareholder)

### Attestation for Entity and Beneficial Owners
The undersigned certifies and agrees (select one):

☑ That none of the entities noted in this document are authorized to issue bearer shares.

☐ That if the entities noted in this document are authorized to issue bearer shares, they have not issued and do not maintain outstanding bearer shares and will not issue bearer shares so long as the entity maintains an account at Citibank. The undersigned understands that Citibank prohibits bearer share entities.

☐ That the entities noted in this document have issued bearer shares but have since converted them into registered shares.

## Section F: Certification

**I certify, to the best of my knowledge, that the information provided in this Beneficial Ownership Declaration is complete and correct and that the Company will notify Citibank promptly of any changes.**

Respectfully submitted,

| | |
|---|---|
| Signature | Date  10/12/2021 |
| Sanjay Singh | President |
| Printed Name | Title |

## Section G: Independent Certification

In certain limited instances, Citibank may require certification of your ownership structure from an independent source, such as your attorney or accountant. We will inform you if this additional certification is required.

I _____ as the attorney/accountant for _____
   (name)                        (select one)                    (Business Name)

hereby certify the contents of this declaration and confirm all details are true and correct.

| | |
|---|---|
| Signature | Date  10/12/2021 |
| License/Registration # | |

©2021 Citibank, N.A. Member FDIC. Citi, Citi with Arc Design and other marks used herein are service marks of Citigroup Inc. or its affiliates, used and registered throughout the world. All rights reserved.

Citi (5/20th)

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

# Beneficial Ownership Declaration
For All Clients Excluding Sole Proprietors



## Instructions for Completing the Beneficial Ownership Declaration

**Section A:**
· Company Name

**Section B:**
· List any individuals who meet the criteria below based on your entity type.

**Section C:**
· List any other entities within the ownership structure of your Company
· For Not-for-Profit/Charitable Organizations, list any entities that donate 10% or more in a fiscal year.

**Section D:**
· Provide a diagram in the space provided, or on a separate document, outlining the complete ownership structure of your Company.

**Section E:**
· Select the applicable box attesting to the status of Bearer Shares in your Company

**Section F:**
· A Controlling Person listed in Section B executes the document by signing, dating, and listing their title.

**Section G:**
· Independent certification by accountant or attorney (only when requested by Citibank)

Complete all applicable sections following the table below

| ALL CUSTOMERS | ADDITIONAL SECTIONS FOR MULTI-LAYERED ENTITIES ONLY | INDEPENDENT CERTIFICATION (only when requested) |
|---|---|---|
| Section A | | |
| Section B | Section C | |
| Section E | | Section G |
| Section F | Section D | |

| | Corporation | Limited Liability Company | Partnership | Unincorporated Association | Not-for-Profit/ Charitable Organization | Single Member LLC | Business Trust |
|---|---|---|---|---|---|---|---|
| **Owners** | Any individual with 10% or more ownership; either directly or indirectly through another entity. For Personal Investment Companies (PICs), individuals with any ownership must be listed. | | | | · Founder<br>· Any donor contributing 10% or more in the last fiscal year; either directly or indirectly through another entity | Owner | · All Grantors<br>· Any vested beneficiaries of 10% or more of the trust assets |
| **Controlling Persons[1]** | Executive Management (e.g. CEO, CFO, President, Chairman) | Executive Management (e.g. CEO, CFO, President, Chairman) | Managing Partners | Executive Management (e.g. CEO, CFO, President, Chairman) | Executive Management (e.g. CEO, CFO, President, Chairman) | Owner | Trustees |
| **Authorized Signers** | Individuals appointed by the legal entity, per Company's Articles of Organization or other formation documents, as authorized signers of the Company, whether signing on Citibank accounts or not. | | | | | Owner | Trustees |

[1]The first individual listed in Section B should be the FinCEN Designated Controlling Person. If the Company is exempt from the FinCEN CDD Rule, Section #1 may be blank. FinCEN Designated Controlling Person is defined as "A single individual with significant responsibility to control, manage or direct the Company, such as a CEO, CFO, managing partner or other individual who performs similar functions".

©2020 Citibank, N.A. Member FDIC. Citi, Citibank, Citi with Arc Design and other marks used herein are service marks of Citigroup Inc. or its affiliates, used and registered throughout the world. All rights reserved.
(Effl. 5/2020)

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

**1** Name (as shown on your income tax return) Name is required on this line; do not leave this line blank.

ROYAL BENGAL LOGISTICS, INC

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☑ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

9600 W SAMPLE ROAD  SUITE 1C0

**6** City, state, and ZIP code

CORAL SPRINGS  FL  33065

Requester's name and address (optional)

**7** List account number(s) here (optional)

*Print or type.*
*See Specific Instructions on page 3.*

---

**Part I** **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

**or**

Employer identification number

| | | | | | | 7 | 1 | 3 | 4 |

---

**Part II** **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**   Signature of U.S. person ▶ *[signature]*   Date ▶ 10/12/2021

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

---

Cat. No. 10231X   Form **W-9** (Rev. 10-2018)

| PRINT | SAVE | CLEAR |
|-------|------|-------|

## CitiBusiness®



| Financial Center # | 0058 | Marketplace | 016 | Current Date | 10/12/2021 |
|---|---|---|---|---|---|
| Tax ID | ▮▮7134 | | | | |
| Business Name | Royal Bengal Logistics, Inc | | | | |

| Account # (S) | Print First and Last Name | Signature |
|---|---|---|
| ▮▮4380 | **Signer 1:** Sanjay Singh | X |
| ▮▮4380 | **Signer 2:** Daniel Sejour | X |
| | **Signer 3:** | X |
| | **Signer 4:** | X |

## CitiBusiness®



| Financial Center # | 0058 | Marketplace | 016 | Current Date | 10/12/2021 |
|---|---|---|---|---|---|
| Tax ID | ▮▮7134 | | | | |
| Business Name | Royal Bengal Logistics, Inc | | | | |

| Account # (S) | Print First and Last Name | Signature |
|---|---|---|
| ▮▮04380 | **Signer 1:** Sanjay Singh | X |
| ▮▮04380 | **Signer 2:** Daniel Sejour | X |
| | **Signer 3:** | X |
| | **Signer 4:** | X |

© 2014 Citibank, N.A., Member FDIC. Citi with Arc Design and CitiBusiness are registered service marks of Citigroup Inc.
(Eff. 10/20/12)

1/04352  9886  04/4

## CONCIERGE COMMERCIAL AO DAILY TRANSACTION/TRANSMITTAL REPORT

| **Business:** | Citibank, N.A.  (000) | **Report Date:** | Wed, Oct 20, 2021 |
| **Financial Center:** | TAMARAC (0493) | **Expense Code:** | 00493 |

### TRANSMITTED COMPONENTS

| | | | |
|---|---|---|---|
| **CFA Name:** | Vivekanand Elango | **CFA P#:** | 4841982 |
| **Session Date:** | Wed, Oct 20, 2021 | | |

| | | | |
|---|---|---|---|
| **Business Name:** | ROYAL BENGAL LOGISTICS,INC | **CIN:** | 5081210067309076 |
| **Business Entity Type:** | S-Corporation | **TaxId:** | ███7134 |
| **Withholding/Certified:** | Certified W-9 | **Recently Applied for:** | N |
| | | **Foreign based Business:** | N |
| **Business Address:** | 9600 W SAMPLE ROAD STE 100 | **Business Phone:** | 1 510-342-6770 |
| | CORAL SPRINGS, FL 33065 | **HRB:** | Y |
| **HRB Description:** | 1. Send/Receive funds to/from countries outside the U.S. | | |
| **D&B Verifications Performed:** | N | **DB Confidence Code:** | 0 |
| **D&B Criminal Activity Indicator:** | | | |
| **Type of Identifier Doc:** | Government internet site printout that documents Entity Formation | | |
| **Identifying Number:** | ████2149 | **State of Identifier Doc:** | Florida |
| **Other:** | None | **Country of identifying Doc:** | UNITED STATES |

**CitiScreening Check (SDN):**   FAIL

**CitiScreening Check (RF):**   Pass

| | | | |
|---|---|---|---|
| **Override Type:** | CitiScreening (SDN) Override | | |
| **Overridden by:** | Vivekanand Elango | **Overridden by P#:** | 4841982 |
| **Approver/Checker Name:** | Raquel Rios | **Approver/Checker SOEID:** | RR11272 |
| **Failed Response** | | **Reason for Override** | |
| | | Approved : Checker Approved | |

**FATCA Classification:**
**   TAX Documents:**                                                    **Received:**

**Account(s)**

| Acct Type | Acct # |
|---|---|
| 1 CB FLEXIBLE CHECKING | ███4380 |

**Signer   1 of   2**

| | | | |
|---|---|---|---|
| **Name:** | SANJAY SINGH | **CIN:** | 5081210067309084 |
| **U.S. Residency:** | US Citizen | **SSN/ITIN:** | ███5364 |
| **DOB:** | ███ 1979 | **Official Title:** | President |
| **High Risk Customer:** | N | **SPF Status:** | N |

**Card Info**

| | | | |
|---|---|---|---|
| **Card Ordered:** | Order Business Debit Card | **Card Printed:** | ATM |
| **Embossed Business Name:** | ROYAL BENGAL LOGISTICS, | **Embossed Signer Name:** | SANJAY  SINGH |
| **Embossed CIN:** | 5081210067309084 | **PIN Set:** | N |

| | |
|---|---|
| **Address Verification:** | **Verified:**  Trans Union Satisfied |
| **TIN to Name Match Verification:** | SSN VALIDATION WAS SUCCESSFUL |
| **Identification:** | **Primary ID:**  PHOTO U.S. DRIVER'S LICENSE |
| | Issuing State : FL |
| | License Number : ██████3090 |
| | Issue Date : 08/21/2014 |
| | Expiration Date : 08/29/2022 |

**Application Recommendation:**   Approve

**Identity Verification (CHEX):**

| | |
|---|---|
| **Recommended Action:** | Approve |
| **Qualifile Score:** | 648 |
| **SSN Validation:** | BECAME AVAILABLE FOR ISSUANCE IN 1997 IN FL |
| **Reason(s):** | A0-A0100001 - OPEN ACCOUNT |
| | AT-ATRITHF0 - TRI-BUREAU ID THEFT |
| | NA-NA - ALERT NOT FOUND |
| | NA-NA - NA |

## CONCIERGE COMMERCIAL AO DAILY TRANSACTION/TRANSMITTAL REPORT

| **Business:** | Citibank, N.A. (000) | **Report Date:** | Wed, Oct 20, 2021 |
| --- | --- | --- | --- |
| **Financial Center:** | TAMARAC (0493) | **Expense Code:** | 00493 |

**TRANSMITTED COMPONENTS, continued**

NA-NA - NA

**CitiScreening Check (SDN):**   Pass

**CitiScreening Check (RF):**   Pass

**Signer Override(s)**
        None

---

**Signer   2 of   2**
| | | | |
| --- | --- | --- | --- |
| **Name:** | DANIEL SEJOUR | **CIN:** | 5081210067309092 |
| **U.S. Residency:** | US Citizen | **SSN/ITIN:** | ████8034 |
| **DOB:** | ████ 1984 | **Official Title:** | Finance Manager |
| **High Risk Customer:** | N | **SPF Status:** | N |

**Card Info**
| | | | |
| --- | --- | --- | --- |
| **Card Ordered:** | Order Business Debit Card | **Card Printed:** | ATM |
| **Embossed Business Name:** | ROYAL BENGAL LOGISTICS, | **Embossed Signer Name:** | DANIEL   SEJOUR |
| **Embossed CIN:** | 5081210067309092 | **PIN Set:** | N |

**Identification:**   **Primary ID:**  PHOTO U.S. DRIVER'S LICENSE
                  Issuing State : FL
                  License Number : ████3500
                  Issue Date : 09/17/2019
                  Expiration Date : 09/30/2027

**CitiScreening Check (SDN):**   Pass

**CitiScreening Check (RF):**   Pass

**Signer Override(s)**
        None

---

# CONCIERGE COMMERCIAL AO DAILY TRANSACTION/TRANSMITTAL REPORT

| **Business:** | Citibank, N.A. (000) | **Report Date:** | Wed, Oct 20, 2021 |
| --- | --- | --- | --- |
| **Financial Center:** | TAMARAC (0493) | **Expense Code:** | 00493 |

### COMPONENTS HELD OVER

*** No Data Found ***

### COMPONENTS REJECTED

*** No Data Found ***







































ROYAL BENGAL – PAYMENTS – 00000TOFFSET – Apr 11









Interest earned year to date  $200.00



Citibank with Arc Design and CitiBusiness are registered service marks of Citigroup Inc.







